No. 93,982

STATE OF KANSAS, *Appellee*, v. JOHN HENRY HORTON, *Appellant.*

(151 P.3d 9)

Opinion filed February 2, 2007.

*B. Joyce Yeager*, of Yeager Law Firm, of Overland Park, argued the cause and was on the brief for the appellant.

*Richard G. Guinn*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, *Steven J. Obermeier*, assistant district attorney, and *Phill Kline*, attorney general, were on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: John Henry Horton appeals his 2004 conviction for first-degree felony murder. Horton's conviction stems from the 1974 disappearance and death of 13-year-old Liz Wilson.

## FACTS

On Sunday, July 7, 1974, 13-year-old Liz Wilson went swimming with her 11-year-old brother John at the public swimming pool in Prairie Village, Kansas. Liz and John lived about 3 or 4 blocks north of the swimming pool, and they often walked to the pool together. The campus for Shawnee Mission East High School is between what was the Wilsons' house and the swimming pool, so Liz and John usually walked past the front of the high school and cut across the high school parking lot to get to the swimming pool.

Liz and John left the pool at approximately 7:15 p.m. John ran ahead of Liz because he wanted to get home first. When John reached the middle of the high school parking lot, he heard Liz call his name and saw her running toward him. John ran faster up the hill on the south side of the high school. When he reached the corner of the high school, he looked back and saw Liz near the front edge of the high school parking lot, coming towards him. John waited in front of the high school for a couple of moments, then peeked around the front of the school to look for Liz. John did not see Liz, so he ran to the other side of the high school to see if she had gone another way. When he did not see her, he ran home.

John returned home without Liz and began watching television. John's parents arrived home about 30 minutes later and asked about Liz. John did not know where Liz was, so her parents began calling friends and neighbors to try to locate her. Unable to find Liz, the Wilsons recruited some neighbors to search for her inside and outside of Shawnee Mission East High School. The Wilsons also contacted police.

The defendant, John Henry Horton, was employed as a custodian at Shawnee Mission East High School. While checking the employee time cards for the high school, the police noticed that Horton had been working at the time of Liz' disappearance and had taken a nearly 3-hour dinner break shortly after the time that

Liz was last seen in the high school parking lot. Officers went to Horton's home in Independence, Missouri, on the morning of July 8, 1974, to question him. Horton's wife told the officers that Horton was at an unemployment office.

After locating Horton at the unemployment office, the officers questioned him about Liz' disappearance. Horton denied any knowledge of Liz' disappearance and gave the officers permission to search his car. In the trunk of Horton's car, officers found three bottles of chloroform; a can of ether; a nearly full gallon bottle of sulfuric acid; a butcher knife; brown cords; and two canvas trash bags. In the passenger compartment of his car, the officers found two throw rugs, a pillow, and a long hair. Horton gave the officers permission to seize the items, and the officers placed them in the trunk of the patrol car without individually bagging them to prevent contamination. The officers did not see any blood in Horton's car.

Horton admitted taking the items found in his trunk from Shawnee Mission East High School while he was scavenging through the building. Horton said he planned to give the butcher knife to his wife and use the sulfuric acid for an experiment. Horton told police that he intended to get high by inhaling the chloroform and ether.

After the officers removed the items from Horton's trunk, they inquired about the clothing Horton had been wearing the previous day. Horton advised the officers that his clothing was at home, so the officers followed Horton back to his house. Horton's clothing was dirty and his shirt had some holes in the back of it. The officers requested permission to seize Horton's clothing, and Horton consented.

While they were at Horton's house, the officers observed fresh scratches on Horton's forehead and behind his right ear. The officers asked Horton to accompany them to the Prairie Village police station for additional questioning. Horton voluntarily accompanied the officers to the police station and cooperated throughout the interview. Horton removed his clothing, allowing officers to observe more scratches on his back, forearm, and thigh. Horton explained that he had gotten the scratches while he was working on his car. Police also noticed that Horton's underwear was bloody.

The blood was identified prior to trial as Horton's wife's blood consistent with Horton's statement during the initial questioning that he had had intercourse with his wife while she was menstruating.

During his interview with the police, Horton recounted his activities on the day Liz disappeared. Horton reported for his shift at the high school a few minutes before 3 p.m. His supervisor advised him that the other custodian would not be working that day and instructed him to water the trees near the library entrance on the south side of the high school. The library entrance is near the sidewalk leading from the high school parking lot to the front of the school's main building, along the route John and Liz normally walked to and from the swimming pool. Horton began watering the trees and admitted that he was watering the trees at approximately 7:30 p.m. Horton told police that he finished watering the trees at about 8:05 p.m. and then clocked out for his dinner break. Horton stated that he left the school and started having car trouble, so he pulled into a grocery store parking lot and worked on his car for about 2 hours. Horton returned to the high school a few minutes after 10 p.m., pulled inside the garage door in the school receiving area, exited his car, and crawled underneath his car to work on it. Horton told police he left after working on his car for a few minutes.

The day after Liz' disappearance, police also interviewed some cheerleaders from Shawnee Mission East High School who had been practicing on the school lawn that Sunday afternoon. The cheerleaders told police that a custodian had approached them and asked if they needed to come into the school building. One of the cheerleaders stated that the custodian specifically asked her if she wanted in the building. When the cheerleader declined, the custodian told her there was a band concert and asked if she wanted to come inside for the band concert. Contrary to the custodian's statement, the school did not have a band concert scheduled for July 7, 1974.

Two days after Liz' disappearance, two teenaged girls, Beth and Mary, advised police that they had a conversation with a custodian at the high school on the day of Liz' disappearance. Both girls

identified Horton as the custodian. Beth and Mary had been play-ing tennis at the Prairie Village public tennis courts near Shawnee Mission East High School and the Prairie Village public swimming pool. As Beth was walking home past the library entrance of the high school, Horton approached her and inquired about the time. Beth told him it was around 7:20 p.m. Horton then asked if she had seen the other custodian and stated that he needed someone smaller to stand on his shoulders to help him shut off the water. At that point, Beth's tennis partner, Mary, walked up and joined the conversation. The girls resumed walking home without assisting Horton. Contrary to Horton's statement regarding the location of the water valve, it was about 1 foot above the ground on the side of the building.

In January 1975, a contractor found a human skull near 105th Street and Lackman Road in Lenexa, Kansas, at the construction site for the JC Penney Distribution Center. At that time, the area was undeveloped, consisting of alfalfa pastures owned by a dairy farmer. After the skull was found, police searched the area and found several other human bones. In February 1975, a farmer who had baled the alfalfa from the pastures during the summer of 1974 found a human bone in a bale of hay. The farmer estimated that the bale with the bone had been cut in July 1974. About the time the hay had been cut, the farmer remembered smelling a strong odor in the alfalfa field. The farmer attributed the odor to some-thing dead but did not observe anything dead.

The county coroner sent the bones to a forensic anthropologist for identification. The forensic anthropologist concluded that all the bones originated from the same person, whom he identified as a 12- to 14-year-old female Caucasian. The Wilson family recov-ered the remains and buried them in Iowa. The grave site was exhumed in 2003 for DNA testing. The DNA testing confirmed that the bones are the remains of Liz Wilson.

By 2001, the case remained unsolved. Prairie Village police re-opened the case and began investigating again. In 2003, the State charged Horton with first-degree felony murder for the death of Liz Wilson. The State's theory was that Horton used chloroform

to kidnap Liz for the purpose of sexually molesting her and accidentally killed her by applying too much chloroform.

At trial, the State presented testimony from the cheerleaders, the tennis players, and employees of Shawnee Mission East High School, along with various law enforcement officers and FBI agents who had interviewed Horton and other witnesses. In addition, the State presented evidence that police had found hairs inside the high school building near the library entrance, inside the passenger compartment of Horton's car, and inside one of the canvas bags from Horton's trunk. An FBI hair analyst from Washington, D.C., testified that in 1974 he compared the hairs from the car and the school with hairs on a brush taken from the Wilson home. The evidence established one hair found in Horton's vehicle to be "microscopically like" and another to be "microscopically similar" to some of the hairs found on the brush. The FBI analysis was not sufficient to establish the gender of the person from whom the hair samples originated or to positively identify the source of the hair. In the absence of a known head hair specimen from Liz, the FBI report refused to assess the significance of the similarities between the hairs. Rather, the report concluded only that the possibility of the hairs originating from the same individual could not be eliminated. Further, the hairs were not available for defense counsel to examine or test for DNA because the FBI had destroyed the hairs in approximately 1985.

To establish Horton's intent to sexually molest Liz, the State presented evidence from Joy Creager, who had lived across the street from Horton in 1974. Joy testified that she was 14 years old in 1974 and had been friends with Horton's niece Cindy, who was living with Horton and his wife during the summer of 1974. Over Horton's objection, Joy Creager testified that she and Cindy accompanied Horton to a nearby golf course one night to get high. According to Joy, Horton held a rag with chloroform under her nose until she passed out. When she regained consciousness, one leg of her pants had been removed and Horton was over her with his fingers in her vagina. Cindy recalled using chloroform with Horton and Joy at the golf course but testified she had observed no sexual abuse of Joy by Horton. Although Joy was aware of Liz'

disappearance and observed police at Horton's house in 1974, she admitted that she had never told anyone about the incident at the golf course until law enforcement officers contacted her in 2002.

A jury convicted Horton of first-degree felony murder. The district court sentenced Horton to life in prison. Horton appeals his conviction directly to this court pursuant to K.S.A. 22-3601(b)(1).

## ANALYSIS

### K.S.A. 60-455 Evidence

Horton first argues that the district court improperly admitted Joy Creager's testimony regarding the incident at the golf course when Horton allegedly encouraged Joy to sniff chloroform and then sexually molested her. Horton argues that the evidence is inadmissible pursuant to K.S.A. 60-455 as a prior bad act. The State argues that the evidence was admissible to show plan, identity, and intent.

When reviewing a district court's decision to admit evidence, an appellate court first determines whether the evidence is relevant. Once relevance is established, an appellate court must apply the evidentiary rules governing the admission and exclusion of evidence as a matter of law or in the exercise of the district court's discretion, depending on the contours of the evidentiary rule in question. Reviewing whether the district court properly admitted evidence pursuant to K.S.A. 60-455 requires the court to review the legal basis for the district court's decision. When an appellate court reviews the legal basis for admitting evidence, the standard of review is de novo. *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006).

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Before admitting evidence of other bad acts or prior crimes, the district court must determine whether the evidence is relevant to any disputed material fact other than the defendant's propensity to commit a crime. Although K.S.A. 60-455 includes a list of potential material facts that may be established by evidence of prior bad acts, the list is not exclusive. Once relevance is established, the district court must weigh the probative value of the evidence against its prejudicial effect. If the evidence is more probative than prejudicial, the district court may admit the evidence. When evidence of other bad acts or crimes is admitted pursuant to K.S.A. 60-455, the district court should give the jury a limiting instruction regarding the evidence. *Gunby*, 282 Kan. at 49.

The first test for admitting evidence of other crimes or bad acts is relevance to prove a disputed fact. Relevant evidence is broadly defined as "evidence having any tendency to prove any material fact." K.S.A. 60-401(b). Before evidence can be considered relevant, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. *Gunby*, 282 Kan. at 47. The relevancy of prior crimes evidence turns on the similarity of the crimes. It is insufficient to show that the crimes are violations of the same or similar statutes. Rather, there must be underlying facts which demonstrate that the prior or other bad act was committed in such a manner as to raise a reasonable inference that the same person committed both offenses. *State v. Higgenbotham*, 271 Kan. 582, 589, 23 P.3d 874 (2001).

The State relies on *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992), to support its argument that Joy Creager's testimony was properly admitted pursuant to K.S.A. 60-455. The State asserts that *Grissom* is instructive because the *Grissom* court upheld the defendant's convictions for three counts of murder even though the victims' bodies were never found and the State could not establish the victims' causes of death.

However, the State's reliance on *Grissom* is misplaced because *Grissom* is factually distinguishable. In *Grissom*, the State had conclusive physical evidence linking Grissom to each victim. Police found a drop of blood from one of the victims and identification

cards with Grissom's photograph in a car that had been rented by one of the victims. In addition, an eyewitness testified about renting a storage unit to a woman matching the description of one of the victims and a man matching Grissom's description. The eyewitness testified that the woman used one of the victim's names and an address associated with Grissom's alias. Other witnesses testified that they observed credit cards belonging to two of the victims in Grissom's car. Moreover, Grissom made statements connecting himself to each victim. In this case, the only evidence with the potential to link Horton to Liz is the hair analysis, which cannot be used for a positive identification, and without a known sample from the victim the significance of the findings is unknown. There are no eyewitnesses who observed Liz with Horton, and the police did not find any of Liz' belongings in Horton's possession. Unlike the defendant in *Grissom*, Horton did not make any statements linking him to Liz.

The State's reliance on *Grissom* is also misplaced because the 60-455 evidence presented in that case was similar to the crimes at issue, making the evidence relevant to a disputed material fact. In *Grissom*, the State sought to establish Grissom's identity, preparation, opportunity, and plan by introducing evidence from a young woman named Michelle Katf, who testified that she awoke to find a man with a gun in her apartment at approximately 2:00 to 2:30 a.m. the week before the first victim disappeared. The man struggled with Katf, then forced her to leave her apartment. After exiting from the apartment with the man, Katf attempted to escape and started screaming. A struggle ensued, and the man ran off. Katf observed a car resembling Grissom's car drive away. Katf testified that Grissom's physical characteristics were consistent with her attacker's. Katf also testified that there were no signs of a forced entry into her apartment, indicating that her attacker had used a key. Police found a master key to Katf's apartment complex in Grissom's car. 251 Kan. at 877-78.

The *Grissom* court upheld the admission of Katf's testimony under K.S.A. 60-455 to prove Grissom's plan, opportunity, and preparation. 251 Kan. at 924-25. The circumstances of Katf's abduction were similar to the circumstances surrounding the disap-

pearance of the missing women in several ways. First, the time frame of Katf's abduction was similar to the three other victims. Katf was abducted during the early morning hours 1 week before the first victim disappeared. Similarly, the evidence surrounding the other victims' disappearances implied that they were abducted during the early morning hours. Second, Katf and the three other victims shared similar characteristics. All three victims and Katf were single, young women living in apartment complexes. Third, Grissom had keys to Katf's and the other three victims' apartments. Neither Katf's nor the other victims' apartments showed signs of a forced entry, indicating that the abductor had a key. Fourth, Katf's apartment, like the missing women's apartments, was undisturbed. Nothing was stolen and nothing appeared to be out of place. These similarities made Katf's testimony relevant to establish Grissom's identity and preparation as the abductor of the three missing women.

In this case, the State fails to demonstrate sufficient similarity between Liz' disappearance and death and Joy Creager's allegations of sexual abuse. The only similarity appears to be the girls' ages. Liz was 13 years old, and Joy was 14 years old. Joy testified that she willingly accompanied Horton to a nearby golf course for the purpose of getting high by inhaling chloroform. Joy stated that Horton poured the chloroform on a rag and handed it to her. When Joy did not like the smell, Horton encouraged her to inhale the chloroform by pushing the rag back to Joy's face. After she had inhaled the chloroform, Joy testified she passed out and awoke to find her pants off and Horton's fingers in her vagina. However, there is no evidence that Liz inhaled chloroform, no evidence that Liz was rendered unconscious by chloroform, and no evidence that Liz was sexually molested. Because there is no evidence to establish a similarity between what happened to Joy and what happened to Liz, Joy's testimony is not relevant to prove any disputed material facts. Consequently, we must conclude that the district court erred when it allowed Joy to testify without requiring sufficient similarity between Liz' disappearance and death and the prior bad act alleged by Joy.

The erroneous admission of prior crimes or bad acts does not require automatic reversal. Rather, the court must determine whether the erroneous admission of the evidence was harmless. *Gunby*, 282 Kan. at 59. K.S.A. 60-261 sets forth the harmless error rule, which provides:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

The State's theory of the case was that Horton kidnaped Liz to sexually molest her and accidently killed her in the process. In order to establish Horton's intent to sexually molest Liz, the State relied only on Joy's testimony, which implied that Horton had a propensity to sexually molest adolescent girls. Without Joy's testimony, there is no evidence that Horton intended to sexually molest Liz. Thus, we must conclude that the erroneous admission of Joy's testimony affected Horton's substantial rights and is inconsistent with substantial justice. Accordingly, we cannot conclude that the erroneous admission of the evidence was harmless.

We appreciate the tragic circumstances surrounding the death of Liz Wilson and the need for finality and accountability of those responsible for her murder. All murders, and especially child murders, cry out for resolution and the need to bring killers to justice. However, any conviction resulting from Liz Wilson's death must be based on evidence that is relevant and satisfies the basic requirements for admissibility as set forth by Kansas law. Here, the trial court ignored a basic standard which has been a part of Kansas law for over 40 years by failing to require the State to show not just a sufficient similarity but any similarity between Liz Wilson's disappearance and death and the alleged prior bad act. See *State v. Wright,* 194 Kan. 271, 275, 398 P.2d 339 (1965) (stating that under 60-455, "evidence of other similar offenses could be admissible to prove identity of the person committing the offense"). Conse-

quently, we reverse Horton's conviction for first-degree felony murder.

*Motion to Dismiss*

Horton argues that the district court should have granted his motion to dismiss after the preliminary hearing. According to Horton, the district court should not have combined the hearing on the State's motion to admit evidence of prior crimes with the preliminary hearing. Horton asserts that the district court erroneously relied on inadmissible evidence to support its conclusion that there was probable cause to bind him over for trial.

When an accused has gone to trial and been found guilty beyond a reasonable doubt, any error at the preliminary hearing is harmless unless the error caused prejudice at trial. *State v. Henry*, 263 Kan. 118, 129, 947 P.2d 1020 (1997). The error Horton claims from the preliminary hearing involves Joy's testimony. Based on our conclusion that the admission of Joy's testimony was prejudicial at Horton's trial, we conclude that the consideration of Joy's testimony at the preliminary hearing is not harmless error.

K.S.A. 2005 Supp. 22-2902(3) requires the district court to bind the defendant over for trial if "from the evidence it appears that a felony has been committed and there is probable cause to believe that a felony has been committed by the defendant." When reviewing the district court's probable cause finding, an appellate court conducts a de novo review of the evidence. *State v. Kraushaar*, 264 Kan. 667, 670, 957 P.2d 1106 (1998).

The State charged Horton with felony murder based on the underlying felony of kidnapping for the purpose of committing indecent liberties with a child, pursuant to K.S.A. 1973 Supp. 21-3401 and K.S.A. 1973 Supp. 21-3420(b). Because the criminal statutes and penalties in effect at the time of the crime apply, we must apply the definition for felony murder in effect on July 7, 1974. See *State v. Denney*, 278 Kan. 643, 646, 101 P.3d 1257 (2004).

In 1974, first-degree murder was defined as follows:

"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony." K.S.A. 1973 Supp. 21-3401.

K.S.A. 1973 Supp. 21-3420(b) provided:

"Kidnapping is the taking or confining of any person, accomplished by force, threat, or deception, with the intent to hold such person . . . [t]o facilitate flight from or the commission of any crime."

The applicable version of K.S.A. 1973 Supp. 21-3503 defined indecent liberties with a child as follows:

"(1) Indecent liberties with a child is engaging in either of the following acts with a child under the age of sixteen (16) years who is not the spouse of the offender:
(a) The act of sexual intercourse;
(b) Any fondling or touching of the person of either the child or the offender done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender or both."

To analyze whether the district court properly denied Horton's motion to dismiss, we must review the facts presented at the preliminary hearing to determine whether they are sufficient to establish that a felony was committed and that there was probable cause to believe that Horton committed the felony. See K.S.A. 2005 Supp. 22-2902(3). " 'Probable cause at a preliminary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain reasonable belief of the accused's guilt.' " *Henry*, 263 Kan. at 130 (quoting *State v. Butler*, 257 Kan. 1043, 1059, 897 P.2d 1007 [1995]).

The State presented evidence that Liz was last seen near the parking lot of the Shawnee Mission East High School shortly after 7:15 p.m. on July 7, 1974. In January 1975, a contractor found a human skull near 106th Street and Lackman Road in Lenexa, Kansas. After searching the area, police found several other human bones. In February 1975, a forensic anthropologist who examined the bones found in Lenexa concluded that the bones were the remains of a 13-year-old Caucasian girl. Later DNA testing confirmed that the bones found in 1975 shared the same genetic markers as Carol Wilson, Liz' mother. This evidence established a homicide.

To establish probable cause that Horton committed felony murder based on kidnapping for the purpose of committing indecent

liberties in accordance with the State's complaint, the State had to prove that Horton:

(1) Caused Liz' death;

(2) while in the process of taking or confining Liz by force, threat, or deception;

(3) with the intent to facilitate fondling or touching Liz in such a way as to arouse or satisfy his or another's sexual desires.

At the preliminary hearing, the State presented evidence that Horton was working as a custodian at Shawnee Mission East High School at the time of Liz' disappearance. Horton's shift began at 3 p.m., and his duties included watering some trees near the sidewalk that connected the parking lot to the front of the school building. A 15-year-old girl who had been playing tennis at the nearby tennis courts spoke with Horton near the trees at about 7:20 p.m. Horton approached the girl and inquired about the time. Horton then asked the girl if she had seen the other custodian because he needed someone to stand on his shoulders and help him turn off a water valve. Horton did not ask the girl to stand on his shoulders, but she presumed he was asking her to help him. About that time, the girl's tennis partner approached and the two girls walked away without helping Horton. A school employee testified that the water spigots were outside the building approximately 1 foot above the ground.

Although Horton normally took his dinner break at 7:30 p.m., he did not clock out for dinner until 8:09 p.m. on the day Liz disappeared. Horton did not clock back in the rest of the evening, but told police that he returned to the school about 10:45 p.m.

The day after Liz disappeared, officers from the Prairie Village Police Department confiscated a bottle of sulfuric acid, a can of ether, three bottles of chloroform, two canvas bags, and a knife from the trunk of Horton's car. Horton admitted taking the items from the school and told investigators that he planned to inhale the chloroform.

Horton's niece Cindy, who was a teenager in 1974, testified that she lived with Horton and his wife in 1974. Cindy testified that she and a neighbor girl named Joy Creager had accompanied Horton to a nearby golf course and Horton had brought some chloroform.

Cindy told law enforcement agents that Horton encouraged Joy to sniff the chloroform and that Joy had passed out.

The State presented testimony from an anesthesiologist regarding the effects of chloroform. Chloroform was used as an anesthetic in the early 1900's, but medical professionals stopped using it because it was dangerous and had bad side effects, like nausea, vomiting, and hallucinations. According to the anesthesiologist, chloroform can cause death by cardiac arrest or asphyxiation if the person's tongue falls into the posterior pharynx and blocks the person's airway.

Although the State presented evidence that Liz died, it did not present any evidence regarding the cause of Liz' death. The doctor's testimony that chloroform can be fatal does not support an inference that Liz died due to chloroform inhalation. Likewise, Horton's possession of chloroform does not support an inference that Liz died due to chloroform inhalation because the State failed to present any evidence to indicate the amount of chloroform that was in the bottles. Without that evidence, there is no support for the inference that Horton used some of the chloroform in the bottles to kill Liz.

The State's evidence established that Horton was at the high school when Liz was last seen, and he took an extended dinner break shortly after the time that Liz was last seen. Horton also had access to a potentially lethal chemical. The circumstantial evidence that Horton was working near the place where Liz was last seen and had a potentially lethal chemical in his trunk is insufficient to convince us that a person of ordinary prudence and caution would conscientiously entertain reasonable belief that Horton killed Liz.

Likewise, we find that the State has failed to establish any evidence that Horton kidnapped Liz. At Horton's trial, the State presented evidence regarding hairs found inside the high school and Horton's car. However, the State did not present any evidence regarding the hairs at the preliminary hearing. Without any physical evidence to establish a possible link between Liz and Horton's car or the high school building, there is insufficient evidence to convince us that a person of ordinary prudence and caution would

conscientiously entertain a reasonable belief that Horton kidnapped Liz.

Finally, we find no evidence to support the State's theory that Horton intended to commit indecent liberties with Liz. There is no evidence that Liz was sexually molested. Without Joy Creager's testimony, the only evidence that could be construed to infer Horton's intent is the tennis player's testimony that she presumed Horton wanted her to stand on his shoulders to shut off a water valve. However, Horton did not attempt to touch the girl or force her inside the building. We find this evidence insufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief that Horton intended to sexually molest Liz.

Because the State failed to present sufficient evidence to convince a person of ordinary prudence and caution to conscientiously entertain a reasonable belief that Horton committed felony murder while kidnapping Liz for the purpose of committing indecent liberties, there is no probable cause to support binding him over for trial. As a result, we must reverse the district court's decision to deny Horton's motion to dismiss. Horton's conviction for felony murder is reversed and the complaint against him is dismissed.

Although Horton's conviction must be reversed and the complaint dismissed, we are not by this opinion precluding any future prosecution on new charges. Consequently, we will briefly address Horton's evidentiary issues in the event the State attempts to try Horton again. Horton argues that the district court improperly admitted hair evidence, physical evidence from his car, police records, and testimony from an accident reconstruction expert. The first test for the admission of evidence is relevance. *Gunby*, 282 Kan. at 47. After relevance is established, this court must apply the rules of evidence either as a matter of law or in the exercise of the district court's discretion depending on the contours of the applicable rule. 282 Kan. at 47.

*Hair evidence*

Horton argues that the hair evidence should not have been admitted during his trial because the hairs were subject to contami-

nation and had been destroyed, preventing him from performing potentially exculpatory DNA testing or impeaching the State's expert. The hair evidence was relevant because it was the only possible physical link between Horton and Liz.

The failure to positively identify a piece of evidence does not preclude the admission of the evidence. The lack of positive identification affects the weight of the evidence as opposed to its admissibility. *State v. Haddock*, 257 Kan. 964, 983, 897 P.2d 152 (1995) (upholding the admission of wood chips found in the defendant's shoes even though the State could not conclusively establish that the wood chips came from the woodpile where the victim's body was found); *State v. Wimberly*, 246 Kan. 200, 207, 787 P.2d 729 (1990) (allowing the admission of fingerprints even though there were other, unidentified fingerprints at the scene of the murder); *State v. Giddings*, 226 Kan. 110, 115, 595 P.2d 1115 (1979) (admitting bullets found in the defendant's home that were similar to bullets that had been in the victim's possession without conclusively identifying them as the victim's bullets). In this case, the State's inability to positively and indisputably identify the source of every hair that was compared does not preclude the admission of the evidence. Rather, the possibility for contamination affects the weight to be given the evidence. The jury bears the responsibility for weighing the evidence, resolving conflicts in the testimony, and drawing reasonable inferences to determine the ultimate facts. *Wimberly*, 246 Kan. at 207. Thus, the district court was not required to exclude the hair evidence because of its potential for contamination.

Likewise the district court properly admitted the hair evidence even though some of the actual hairs had been destroyed and were not subject to additional testing by Horton. To challenge the destruction of evidence, Horton must establish that the State acted in bad faith. See *State v. Finley*, 273 Kan. 237, 240-41, 42 P.3d 723 (2002). The determination of whether the State acted in bad faith is based on whether the law enforcement agency knew about the exculpatory value of the evidence at the time the evidence was lost or destroyed. 273 Kan. at 241. In this case, the evidence was destroyed in approximately 1985, before law enforcement agencies

could predict that DNA testing would become available or that Horton would be brought to trial in 2004. Horton fails to establish that the FBI acted in bad faith when it destroyed the hair evidence. Consequently, we find no error in the district court's decision to admit the hair evidence.

*Physical evidence from Horton's car*

Horton asserts that the district court should have suppressed the physical evidence taken from his car because there was no indicia of reliability in the State's chain of custody and no reasonable certainty that the objects were securely maintained to prevent alteration. Horton's argument is based on the police officer's failure to individually package each item before placing it in the trunk of his police car. This evidence is relevant because it links Horton with a potentially lethal substance, a weapon, and a means of moving a body.

A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility. *State v. McGhee*, 226 Kan. 698, 703, 602 P.2d 1339 (1979). In this case, an officer testified that the objects appeared to be the same objects that were collected in 1974. Thus, the district court properly admitted the objects from Horton's car for the jury to consider.

*Police Records*

Horton complains that the district court improperly admitted the transcript of his interview with the Prairie Village police and allowed police officers to testify by reading from their reports. Horton's statement is relevant because it provides Horton's account of his activities on the day Liz disappeared and his purposes for the items in his trunk. The officers' testimonies were relevant because they established Horton's presence in the vicinity where Liz was last seen alive.

We find no merit to Horton's claims. The transcript of Horton's out-of-court statements to police was admissible pursuant to K.S.A. 60-460(g), which provides an exception to the hearsay rule for admissions by a party. See also *State v. Watkins*, 219 Kan. 81, 89-91, 547 P.2d 810 (1976) (allowing the transcript of defendant's statement to police to go to the jury room without also sending transcript of defendant's testimony at trial). Likewise, the district court properly allowed the officers to use their reports to refresh their memories. See *State v. Kelly*, 19 Kan. App. 2d 625, 628-29, 874 P.2d 1208 (1994) (quoting *McNeely v. Duff*, 50 Kan. 488, Syl. ¶ 1, 31 Pac. 1061 [1893]).

*Accident Reconstruction Expert*

Horton argues that the district court improperly admitted a report by an accident reconstruction expert with the Kansas Highway Patrol. Horton asserts that the diagram and report improperly clarify witness testimony based on speculation. The accident reconstruction expert prepared a diagram showing the possible path of travel for Liz, John, and the tennis players. The diagram was based on the police reports from the interviews with John and the tennis players. Using a 1999 study entitled *Acceleration and Speeds of Young Pedestrians* by Rodney Vaughan and John Bain, the accident reconstruction expert hypothesized that it took Liz between 13.3 seconds and 53 seconds to reach Horton's location near the trees after John observed her in the parking lot.

Horton did not object to the accident reconstruction expert's testimony or reports and has failed to preserve this issue for appeal. A party must raise a timely and specific objection at trial to preserve the issue for appeal. K.S.A. 60-404; *State v. Torres*, 280 Kan. 309, 319, 121 P.3d 429 (2005).

We reverse Horton's conviction for felony murder, vacate his sentence, and dismiss the complaint against him.

ALLEGRUCCI, J., not participating.
LOCKETT, J., Retired, assigned.