IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 101,054

STATE OF KANSAS,
*Appellee*,

v.

JOHN HENRY HORTON,
*Appellant.*

SYLLABUS BY THE COURT

1.

A district court may properly consider the weight of proffered evidence as a factor in deciding whether to reopen the presentation of evidence after the party has rested its case.

2.

Application of harmless error analysis does not impermissibly intrude on the province of the jury.

3.

Under K.S.A. 60-456, the opinion testimony of experts on an ultimate issue is admissible only so far as the opinion will aid the jury in interpreting technical facts or understanding the material in evidence. An expert's opinion is admissible up to the point where expressing the opinion requires the expert to pass upon the credibility of witnesses or the weight of disputed evidence.

**4.**

The weight that an expert's opinion is to be given lies in the hands of the jury.

**5.**

Under K.S.A. 60-456(b), although the district judge controls expert opinion evidence that has the potential to unduly prejudice or mislead a jury or confuse the question at issue, it is generally preferred to allow the jury to resolve disputed evidence by such tools as cross-examination, the submission of contrary evidence, and the use of appropriate jury instructions.

**6.**

When a foundation in the expertise of a dog handler has been established, including factors such as training, experience, and certification, as well as the reliability of the dog, evidence stemming from a canine search may be admitted into evidence.

**7.**

An element of allowing such foundation evidence is whether the opposing party has the opportunity to carry out adequate cross-examination of the witness.

**8.**

Inclusion of the language "another trial would be a burden on both sides" in the instructions to a jury is error.

**9.**

It is not sufficient simply to lodge an objection in order to preserve an issue; the articulated basis of the objection must be specific to the error asserted on appeal.

10.

On the facts of this case, inclusion of the language "[a]nother trial would be a burden on both sides" in the jury instruction given, while erroneous, was not reversible error. There was no real possibility the jury would have rendered a different verdict if the error had not occurred.

Appeal from Johnson District Court; JAMES FRANKLIN DAVIS, judge. Opinion filed August 8, 2014. Affirmed.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Stephen M. Howe*, district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Steve Six*, former attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

ROSEN, J.: Following the reversal by this court of his conviction in his first trial, John Henry Horton appealed from his conviction of first-degree felony murder at his second trial. While retaining jurisdiction over the case, this court remanded the case to the district court for evidentiary findings and conclusions relating to the narrow issue of reopening the defense case based on evidence that came to light after the jury began its deliberations. The district court ruled adversely to Horton on remand, and he reasserts that issue before this court. All issues raised by the parties in the appeal from his second trial are now ripe for decision.

In July 1974, 13-year-old L.W. disappeared on her way home from a public swimming pool in Prairie Village. Skeletal remains were found in a nearby undeveloped

field several months later. In 2003, DNA confirmed that the remains were L.W.'s. The State charged Horton with first-degree felony murder. More detailed facts underlying his conviction are set out in the decision in the original appeal, *State v. Horton*, 283 Kan. 44, 151 P.3d 9 (2007), and the decision remanding for further proceedings, *State v. Horton*, 292 Kan. 437, 254 P.3d 1264 (2011). Facts necessary for determining specific issues will be explained in our discussion of those issues below.

*Reopening the Case After the Jury Began Its Deliberations*

After hearing arguments on the second appeal, this court remanded the case for a hearing limited to the issue of reopening the case based on the correct legal standards. Following the hearing and judgment of the district court, the parties reargued the issue before this court. The record is now sufficiently complete to allow appellate review.

Two inmates who were incarcerated at the same facility as Horton, Danny Barnhouse and Sergio Castillo-Contreras, testified at the second trial. Barnhouse testified that Horton had told him that he was in prison because he had accidentally killed a little girl. Barnhouse said that Horton told him he abducted the girl and used chloroform on a rag to render her unconscious. He then had intercourse with her until she woke up and began fighting with him, scratching his face. He became angry and applied the chloroform again until she stopped moving. Horton then said that he dumped her body in a field.

Castillo-Contreras similarly testified that Horton had told him that Horton had used a rag containing a chemical to make a girl unconscious and that he killed her when she woke up during his sexual assault and fought with him. Castillo-Contreras also testified that Horton said he should have chopped up the body to prevent it from being found.

4

A third inmate, Michael Buddenhagen, testified that Barnhouse asked him for assistance in looking up the opinion from Horton's first appeal on a computer legal opinion data base. Buddenhagen testified that both Barnhouse and Castillo-Contreras looked at the opinion in his presence. His testimony was introduced for the purpose of suggesting that the other two inmates might have crafted their testimony based on what they read instead of reporting what Horton really told them.

Following the testimony of other witnesses on a variety of topics, the parties rested and made closing arguments to the jury. Then, on the morning of March 5, 2008, while the jury was still deliberating, counsel for Horton made a motion to suspend jury deliberations in order to allow counsel to procure an accurate translation of a recorded telephone conversation of July 2007 between Castillo-Contreras and Castillo-Contreras' mother. The defense requested a 2-day continuance in order to determine whether it would be appropriate to ask to reopen the evidentiary presentation.

The defense had subpoenaed the telephone records in February 2008 before the trial began. The phone records were received about a week later and were turned over immediately to a translator. Unfortunately, problems arose in obtaining a translation because the conversation involved a Chilean dialect of Spanish and because specific software was required in order to listen to the conversation. Furthermore, the software had idiosyncrasies that made it difficult for the translator to hear the speech.

As explained in *Horton*, 292 Kan. 437, the district court, operating under the belief that it had no authority to reopen the presentation of evidence after the parties rested, denied the motion to suspend jury deliberations. This court pointed out that Kansas has long recognized the discretion of a district court to reopen cases under appropriate circumstances and held that the district court abused its discretion by refusing to exercise

5

its lawful discretion. See 292 Kan. at 438-40. We suspended the appeal and remanded the case to the district court for determination of the narrow issue of whether it should have reopened the presentation of evidence to allow the jury to hear evidence relating to the recording of Castillo-Contreras' telephone conversations and any rebuttal evidence offered by the State. 292 Kan. at 441.

The task of the district court was to determine what it would have done at the time of trial with the proffer of testimony if it had applied the proper legal principles in making its decision. In making this determination on remand, the district court conducted several hearings and reviewed translated transcripts of the telephone conversations that triggered the motion as well as additional recorded conversations between Castillo-Contreras and his family, even though the defense did not refer to these additional conversations at the time it moved to reopen the case.

On remand, the district court had available the complete transcripts of the telephone conversations. Of course, at the time of the motion at the original trial, the district court did not have these transcripts available, and the contents of the conversations were speculative at that time. A review of the transcribed conversations reveals some statements by Castillo-Contreras that might lead a fact-finder to question his veracity, but there is no point at which he expressly says or even strongly hints that his testimony was perjured in exchange for a reduced term of incarceration. The transcripts contain no direct confession of perjury.

The primary conversation is subjectively unclear and ambiguous; it refers to unidentified people and it appears to assume that the participants already knew what is going on. It apparently deals with two, possibly related topics: a deal that Castillo-Contreras wanted to work out with the district attorney and with payments that were sent to Castillo-Contreras' family, perhaps as a form of protection money extorted from

6

Horton's family in exchange for Horton's safety in prison. It appears from the conversations that the prosecution did not originally want to use Castillo-Contreras as a witness, but other witnesses were proving to be unreliable. Castillo-Contreras insisted that he be released to Chilean jurisdiction in exchange for his testimony.

Two additional telephone conversations between Castillo-Contreras and his family were transcribed, translated, and presented to the district court at the remand hearing. They related to his hope for deportation in exchange for his testimony and his efforts to communicate with an attorney.

In addition to reading the transcribed telephone conversations, the district court heard the sworn testimony of several witnesses. Yolanda Bustamante, a court-certified interpreter, informed the court that she received CDs of the telephone conversations before the trial began and finished listening to them while the trial was in progress. She was instructed by defense counsel to let him know if she heard anything "interesting," and it was her recommendation that the recordings be transcribed and translated.

Brad Cordts, a Kansas Bureau of Investigation agent assigned to work on the Horton case in 2007, was called to the witness stand by the defense. Cordts had testified at the trial that prosecutor Steve Maxwell told him about Castillo-Contreras and that Maxwell was contacted by Robert Stevenson, chief investigator at Norton Correctional Facility. Cordts then interviewed Castillo-Contreras at the Johnson County Jail. Cordts also testified at the remand hearing but did not disclose any information calling into question Castillo-Contreras' candor.

Stevenson, who was assigned to the case by the Kansas Department of Corrections and whose name was mentioned in the transcribed conversations, testified about his knowledge of Castillo-Contreras reliability as a jailhouse informant. Castillo-Contreras

7

was a jailhouse informant at Norton Correctional Facility and was used to help monitor the Hispanic population. Stevenson testified that he had no memory of Castillo-Contreras being used to target a particular person.

In *Horton*, 292 Kan. at 438-41, we directed the district court to apply the factors set out in *State v. Murdock*, 286 Kan. 661, 672-73, 187 P.3d 1267 (2008). In *Murdock*, this court, quoting from *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985), explained the factors a trial court should consider in exercising its discretionary authority to allow a party to reopen its case:

> "'In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for fail[ing] to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not "imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." [Citation omitted.]'"
> *Murdock*, 286 Kan. at 672-73.

The district court took into account both the transcribed conversations and the testimony of the witnesses. In reaching its decision on remand that it would be inappropriate to reopen the case to allow Horton to bring in the telephone conversations, the district court considered several factors.

First, the district court determined that the late introduction of the evidence would overemphasize that particular testimony to the jury and would be prejudicial to the State because the State would have to overcome the likely undue importance attached to the evidence. Second, the character of the evidence did not strongly indicate dishonesty on

the part of Castillo-Contreras and did not offer information that was not available at trial. While the transcription showed that he wanted a deal and was not testifying only "because it was the right thing to do," the transcription did not show that a deal was actually made. The transcription may have hinted that the prosecution coached Castillo-Contreras on the facts of the case and what it wanted to hear him say. It was brought out at trial that he had read the published opinion from the first appeal and understood the facts from that trial. Third, the district court considered the practical effect of granting the defense motion. As it turned out, the transcription and translation of the recording required nearly 60 days and 250 hours to complete. Postponing jury deliberations for such an extended time would have severely impaired the jury's ability to consider the evidence fairly. Finally, the delay on the part of the defense in attempting to introduce the telephone conversations was understandable and forgivable because technical problems hindered the defense in ascertaining whether the conversations might be useful in presenting its case. As soon as the defense was alerted that the conversations had content that related to the case, it acted to inform the court.

The district court concluded that the transcribed telephone conversation met "the low threshold of admissibility because it does affect Mr. Castillo-Contreras' credibility to a certain extent." The court went on to decide, however, that the potential prejudice to the State and the likely disruption to the trial proceedings outweighed the probative value of the evidence and that reopening the case would have brought about an unjust result.

Horton argues that the prejudicial delay aspect of the *Murdock* criteria is negated by an analysis of the reasons for the delay. The essence of his argument is that defendants should not suffer prejudice because circumstances beyond their control compelled them to wait until late in the trial process to present relevant evidence.

9

While Horton's argument has force, it should be kept in mind that the *Murdock* factors represent a balancing of interests. Waiting until after the jury has begun deliberating may prejudice the opposing party; and not allowing a defendant to present substantial, relevant evidence may also create prejudice against a defendant. Furthermore, strong justification for a party's failure to present the case during the regular statement of the parties' cases may help excuse the failure to present the evidence in a timely manner.

An important additional factor, however, is the weight of the evidence. A district court may, in its discretion, admit tangentially relevant evidence during a case-in-chief that it would not allow after jury deliberations have begun, because the potential prejudice against the State would be greater than the potential prejudice against the defendant, *even if* the late admission were not the fault of the defendant. The defendant's degree of fault may therefore become a nonissue under the *Murdock* factors, and the district court was not required to address that as a factor in explaining why it reached its decision.

Horton also challenges the district court's evaluation of the character of the proffered evidence. The district court made passing reference to the inadmissibility of hearsay statements by Castillo-Contreras' family members, which Horton challenges as an inaccurate statement of the law. Because the statements were not being offered as proof of the matters asserted, Horton argues the district court erred as a matter of law.

While Horton's argument is correct in the abstract, it does not present this court with reversible error. The statements of the family members were of minor substance and tended to repeat or confirm what Castillo-Contreras was presenting as either a monologue or a series of directions. A review of the telephone conversations does not produce any evidence beyond that which Castillo-Contreras himself stated and which the district court considered in its ruling.

10

Horton then attacks the district court's analysis of the effect that admitting the evidence would have had on the trial. The essence of his argument is that it should have been left to the jury to evaluate whether the recordings undermined Castillo-Contreras' testimony. Although it is true that to a limited extent the district court placed itself in the jury's stead, we note that courts often step into the role of determining whether admitting certain evidence would have made a difference to a jury. In a sense, the harmless error doctrine invades the province of the jury, but appellate courts frequently engage in weighing the possible effects of evidence on a jury. See, *e.g.*, *Fry v. Pliler*, 551 U.S. 112, 116, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (lower harmless error standard in federal habeas corpus collateral review of state court decision); *Washington v. Recuenco*, 548 U.S. 212, 218, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (Supreme Court has repeatedly recognized that most constitutional errors can be harmless); *State v. Sampson*, 297 Kan. 288, 299-300, 301 P.3d 276 (2013) (abuse of discretion subject to harmless error standard of review). Therefore, application of the harmless error standard does not impermissibly intrude on the province of the jury.

As the district court noted, this court has held that newly discovered evidence merely tending to impeach or discredit the testimony of a witness is not grounds for granting a new trial. See, *e.g.*, *Baker v. State*, 243 Kan. 1, 11, 755 P.2d 493 (1988). The evidence that Horton sought to introduce after the jury began deliberating was not newly discovered; at that point in time, the defense did not know whether it had anything to present to the jury.

The telephone conversation evidence which Horton urges this court to send to a jury as part of a retrial is very weak in terms of its probative value. In some ways, it bolsters the State's case—Castillo-Contreras told his mother that he overheard Horton acknowledging his crime. In other ways, the evidence merely adds additional emphasis to

11

what was already before the jury, such as information that Castillo-Contreras had read the facts of the case before he spoke with prosecutors. And some of the evidence casts doubt on his motives for testifying, such as his vehement insistence that he receive some sort of deal in exchange for testifying, even though no deal was assured.

These statements are isolated examples extracted from a lengthy conversation in which Castillo-Contreras explicitly and without any prompting told his mother that Horton confessed to him that he had committed murder. While cross-examination based on those statements might have opened up further doubt about his credibility, the defense had already challenged that credibility at trial, especially by pointing out that Castillo-Contreras had read the published opinion of this court before testifying. Horton asks this court to find that the district court abused its discretion because it held that it would not have interrupted jury deliberations to allow the defendant to introduce this marginally relevant impeachment evidence. Such an appellate determination would substantially lower the threshold for abuse of discretion.

We conclude that the district court performed the duty that we instructed it to carry out on remand. It was thorough in creating and reviewing a record of the issue and analyzing the law. We find no abuse of discretion in its conclusions.

*Animated Reconstruction Video*

Over Horton's objection, the State introduced into evidence an animated reconstruction video of the relative locations and movements of L.W., Horton, and witnesses. Horton argues on appeal that allowing the jury to view the video constituted prejudicial error.

12

In the first appeal, Horton raised the issue of whether the State could introduce a reconstruction report, including a diagram with a posited path of travel for the victim. We declined to address the issue, citing the lack of a contemporaneous objection. *Horton*, 283 Kan. at 63. During the second trial, the State expanded on that reconstruction through an animated video that it presented to the jury.

Before the second trial began, Horton moved to exclude the video. The district court conducted an evidentiary hearing in limine and considered the testimony of John Glennon, a forensic automotive technologist, who testified that the assumptions underlying the reconstruction were speculative and flawed. The court nevertheless elected to allow the State to present the video in support of its case.

Over Horton's repeated objections, the jury later watched the video reconstruction and heard the testimony of Captain Dan Meyer, who provided data used in creating the video, and Roy Buchanan, who created the video and explained to the jury what the video purported to represent. According to the video reconstruction, based on their previously observed speeds and directions of travel, Horton and L.W. would have found themselves in the same place at a particular time, giving Horton the opportunity to abduct her.

Horton urges this court to reverse his conviction because the video assumed facts not in evidence and permitted the jury to consider expert testimony that was speculative in nature.

Under K.S.A. 60-456, the opinion testimony of experts on an ultimate issue is admissible only so far as the opinion will aid the jury in interpreting technical facts or understanding the material in evidence. An expert's opinion is admissible up to the point where expressing the opinion requires the expert to pass upon the credibility of witnesses

13

or the weight of disputed evidence. *State v. Bressman*, 236 Kan. 296, Syl. ¶¶ 3, 5, 689 P.2d 901 (1984).

The weight that an expert's opinion is to be given lies in the hands of the jury. *State v. Johnson*, 286 Kan. 824, 837, 190 P.3d 207 (2008); *City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 8, 160 P.3d 812 (2007). Under K.S.A. 60-456(b), although the district judge controls expert opinion evidence that has the potential to unduly prejudice or mislead a jury or confuse the question at issue, it is generally preferred to allow the jury to resolve disputed evidence. Cross-examination, the submission of contrary evidence, and the use of appropriate jury instructions are the favored methods of resolving factual disputes. *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 461, 14 P.3d 1170 (2000).

We find no error in the decision by the district court to allow the State to play the video for the jury. The video and accompanying testimony helped illustrate the State's complex theory, and the video served as nothing more than an aid to the jury in understanding that theory. Rather than proving that Horton and L.W. were in the same place at the same time, the video may be understood as establishing the plausibility of the State's theory that Horton and L.W. crossed paths. The jury had the opportunity to evaluate the reliability of the video and its assumptions. Many of the assumptions underlying the reconstruction were based on the statements of witnesses whose credibility was already before the jury, such as the fact that L.W.'s younger brother was running along a certain path and that Horton was standing by certain trees.

*The Exclusion of Exculpatory Dog-Search Evidence*

Administrative records showed that almost 3 weeks after L.W. disappeared, on July 27, 1974, Tom McGinn, a dog handler from Pennsylvania, brought two dogs to

14

perform a search of the high school where L.W. was last seen. The dogs had been exposed to and later alerted to L.W.'s clothes. The dogs alerted to the victim's scent on steps leading from the lower parking lots to the upper parking lots south of the high school. They did not alert to her presence in Horton's car or on his clothes.

At trial, however, Horton's counsel was unable to locate McGinn and was unable to identify the authors of the Federal Bureau of Investigation report favorably referring to the search. The district court elected to exclude the evidence because there was no basis for establishing the reliability of the reports. On appeal, Horton challenges this exclusion.

When a foundation in the expertise of a dog handler has been established, including factors such as training, experience, and certification, as well as the reliability of the dog, evidence stemming from a canine search may be admitted into evidence. See, *e.g.*, *State v. Brown*, 266 Kan. 563, 573-74, 973 P.2d 773 (1999); *State v. Netherton*, 133 Kan. 685, 690-91, 3 P.2d 495 (1931); *State v. Fixley*, 118 Kan. 1, Syl. ¶¶ 1, 2, 233 P. 796 (1925); *State v. Adams*, 85 Kan. 435, Syl. ¶ 3, 116 P. 608 (1911). An element of allowing such foundation evidence is whether the opposing party has the opportunity to carry out adequate cross-examination of the witness. See *Brown*, 266 Kan. at 574; see also *State v. Barker*, 252 Kan. 949, Syl. ¶ 6, 850 P.2d 885 (1993) (probable cause for vehicle search based on canine sniff requires foundation testimony; minimum requirement includes description of the dog's conduct, training, and experience by knowledgeable person who can interpret the conduct as signaling the presence of a controlled substance).

In the present case, Horton was unable to produce the authors of the 35-year-old FBI report relating to the dog search tending to exonerate him. He maintains, in essence, that the probative value of the report outweighs its questionable reliability. He suggests that because the report included police and FBI records, the report must be reliable.

15

In the first appeal, *State v. Horton*, 283 Kan. 44, 60-62, 151 P.3d 9 (2007), this court held that the trial court did not err in allowing the State to present evidence tending to show that hairs found in the high school, inside the passenger compartment of Horton's car, and inside one of the canvas bags in Horton's trunk belonged to the victim, even though the original hairs had been destroyed in the intervening years and could not be positively tested for DNA compatibility. Horton argues that admitting testimony relating to the hairs while excluding the canine-search report unfairly favored the State.

We held in the first appeal:

"The failure to positively identify a piece of evidence does not preclude the admission of the evidence. The lack of positive identification affects the weight of the evidence as opposed to its admissibility. [Citations omitted.] In this case, the State's inability to positively and indisputably identify the source of every hair that was compared does not preclude the admission of the evidence. Rather, the possibility for contamination affects the weight to be given the evidence. The jury bears the responsibility for weighing the evidence, resolving conflicts in the testimony, and drawing reasonable inferences to determine the ultimate facts. [Citation omitted.]" 283 Kan. at 61.

The differences between the evidence of the hairs and the evidence of the dog search lie in both the foundation that could be established for each and the cross-examination to which each could be subjected. Even though the hairs taken from Horton's car had been destroyed, the State provided a witness who had examined the hairs and who testified about the procedures he used to compare the evidence from the car with hairs taken from the victim's brush. The defense cross-examined the witness about his conclusions and the reliability of the evidence.

16

Although the dog-scent evidence was relevant and material, in that it had a direct bearing on a central question of whether Horton had physical contact with the victim, that was not enough to make it admissible. Because the parties could not subject McGinn to direct or cross-examination, the jury could have only speculated on how reliable the search was. It is unknown what experience McGinn had with the particular dogs that were used; it is unknown how the dogs were trained; it is unknown how they would alert in different situations; it is unknown how consistent their alerting was; it is unknown whether McGinn had problems with the dogs' reliability in other settings; and it is unknown on what basis the FBI reporters evaluated McGinn's reliability.

For these reasons we conclude that the trial court did not err as a matter of law and did not abuse its discretion in excluding the dog-search report.

*The Jury Instruction*

Horton objects on appeal to a jury instruction directing the jury to try to resolve any differences of opinion and reach a consensus.

Jury Instruction 23 read in its entirety:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. Another trial would be a burden on both sides.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary."

Horton's counsel offered a general objection, stating that the proposed jury instruction was "unnecessary." He went on to say, "I believe it will be coercive on the jury. I believe it would give them the impression that they don't have the freedom to disagree and state their points." After taking the matter under advisement, the court elected to give the proposed jury instruction.

When analyzing a properly preserved jury instruction issue on appeal, this court follows a progressive step analysis:

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012.)

In determining whether a specific jury instruction was erroneous, this court considers the instructions as a whole without isolating any one instruction and reviews the instruction to see whether it properly and fairly stated the law as applied to the facts

18

of the case and could not have reasonably misled the jury. *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

The jury instruction at issue generally resembles that approved in *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Until recently, a line of Kansas cases upheld the language that is the subject of this appeal. See, *e.g.*, *State v. Nguyen*, 285 Kan. 418, 436-37, 172 P.3d 1165 (2007); *State v. Scott-Herring*, 284 Kan. 172, 180-81, 159 P.3d 1028 (2007); *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003); *State v. Noriega*, 261 Kan. 440, 454, 932 P.2d 940 (1997); *State v. Roadenbaugh*, 234 Kan. 474, 483, 673 P.2d 1166 (1983); *State v. Irving*, 231 Kan. 258, 265-66, 644 P.2d 389 (1982).

Horton's second trial took place in March 2008. This court subsequently determined that the language that "another trial would be a burden on both sides" is error because it is misleading and inaccurate: "Contrary to this language, a second trial may be burdensome to some but not all on either side of a criminal case. Moreover, the language is confusing. It sends conflicting signals when read alongside [an] instruction that tells jurors not to concern themselves with what happens after they arrive at a verdict." *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009). We concluded, however, that the standard of review was clear error, and we were firmly convinced that there was no real possibility that the jury would have rendered a different verdict had the error not occurred. 288 Kan. at 267.

While it is true that Horton objected to the instruction, his objection was based on the allegedly coercive and superfluous nature of the instruction, not on the confusing elements that formed the grounds for error that we found in *Salts*. It is not sufficient simply to lodge an objection in order to preserve an issue; the articulated basis of the objection must be specific to the error asserted on appeal. See K.S.A. 60-404 (objection

must be "so stated as to make clear the specific ground of objection"); *State v. McCaslin*, 291 Kan. 697, 707-08, 245 P.3d 1030 (2011) (while there may be some overlap of objections, that overlap does not satisfy the specificity requirement of the objection); *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002) (hearsay objection at trial not sufficient to raise issue of Confrontation Clause violation on appeal).

In the absence of a sufficiently specific objection, this court will review the instruction for clear error. See K.S.A. 22-3414(3) (party may not assign error to instruction unless party objects "stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction . . . is clearly erroneous"); *State v. Williams,* 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

If a jury instruction that was not adequately preserved for appeal is erroneous, then this court inquires into reversibility and assesses whether it is firmly convinced that the jury would not have reached a different verdict had the instruction error not occurred. The party asserting a clearly erroneous jury instruction has the burden of establishing the degree of prejudice necessary for reversal. *Williams*, 295 Kan. 506, Syl. ¶ 5.

In his brief, Horton points to various statements made by jurors in voir dire and by witnesses at trial that referred to the previous trial and conviction. Horton argues that there was a real possibility that the jury was influenced by language reminding it of the burden of a subsequent trial.

Nothing in the record suggests, however, that the jury was confused by the instruction or that the jury was close to a deadlock. The jury did not submit questions relating to its burden or inform the judge that it was having difficulty reaching a decision. Furthermore, witnesses from the time of the murder linked Horton to the victim, and witnesses who spoke with him while he was incarcerated testified that Horton

acknowledged committing the crime. For these reasons, we are not firmly convinced that the jury would have returned a different verdict if the instruction had not been given. The instruction was therefore not clearly erroneous. See *State v. King*, 297 Kan. 955, 985-86, 305 P.3d 641 (2013) (in the absence of evidence of deadlock and in the presence of compelling evidence of guilt, no clearly reversible error in giving *Allen*-type instruction).

While the jury instruction was not legally appropriate, the objection was not sufficiently specific to avoid a clear error harmlessness test. The record simply does not support reversal on this issue.

Finding no reversible error, we affirm the conviction.

MORITZ, J., not participating.

MICHAEL J. MALONE, District Judge, assigned.[1]

[1]**REPORTER'S NOTE:** District Judge Malone was appointed to hear case No. 101,054 vice Justice Moritz pursuant to the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.