NOT DESIGNATED FOR PUBLICATION

No. 116,628

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT DICKERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed November 9, 2018. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier* and *Jennifer S. Tatum*, assistant district attorneys, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: Robert Dickerson appeals his conviction for aggravated indecent liberties with a child. He raises several claims of error. First, he complains about a late amendment of the charging document by the State. Next, he raises two evidence issues. He argues that the district court improperly admitted a forensic interview of a child and, later, a Facebook Messenger conversation. Finally, he also thinks the prosecutor erred by appealing to the sympathy of the jury. In our review, we have considered all of his claims and are unmoved.

1

Our review of the record reveals that Dickerson was not prejudiced by the State's amendment of the Information, even though it came after the close of the evidence. Looking at his two evidence issues, first, we do not adopt his position that a forensic interview of a child is expert testimony that needs to be qualified as such. Second, we find no abuse of discretion by the court when it admitted the Facebook message, even though there was conflicting evidence about the message, because the State satisfied its burden of showing the message was authentic. Finally, after considering the prosecutor's comments in context, we are not persuaded they were an improper appeal to the sympathies of the jury. We affirm.

*We outline the evidence.*

In early 2014, C.B., a 15-year-old girl, and S.S., a 13-year-old boy, were dating and sexually active. C.B. moved in with her grandmother, where she was home schooled, and S.S. lived with his grandmother, Jackie, and his step-grandfather, Dickerson. C.B. would often visit S.S.'s home and, on at least one occasion, was alone with Dickerson. This is when the trouble started.

When S.S. got home from school one afternoon, C.B. was at his home and told him that Dickerson had touched her. C.B. had been alone with Dickerson all day. She said he touched her while she was in the bathroom and then later in the bedroom. C.B. did not want to tell anyone else because she did not want to break up with S.S.

But, according to C.B., things "started getting weird" and C.B. did tell. On Memorial Day weekend in 2014, she told her great-grandmother, Geraldine Croom, that Dickerson "used his fingers" on her and "ate her out."  She later disclosed to her grandmother, Carla Simpson, that Dickerson "fingered" her in the bathroom and "ate her out" in the bedroom. C.B. also told Z.S., S.S.'s older brother, that Dickerson "went down on her inappropriately."

2

Later, C.B. repeated her allegations to Jacob Newell, a social worker with the Kansas Department for Children and Families. Then she disclosed what happened to Jennifer Washam, a forensic interview specialist at Sunflower House. In those interviews, C.B. detailed what happened when she spent the day alone with Dickerson:

- Her grandmother dropped her at Dickerson's house in the morning so she could do laundry. Jackie was at work and the kids were at school.
- She and Dickerson went to an auction where he purchased a drain snake. They went to a grocery store and looked at flowers.
- Back at the house, Dickerson asked to kiss her.
- He kissed her and undid her belt. In the bathroom, he put his hand down her pants and started "fingering" her. She asked him to stop and tried to walk away.
- He said he was not done with her and guided her to his bedroom.
- He put her on his bed, removed her pants, and started "eating her out." She covered her eyes, cried, and asked him to stop. She told him that it hurt. Dickerson told her he liked it when she made noise.
- He went into the bathroom and washed his mouth out with mouthwash.
- He told her not to tell anyone.

A few days later, Dr. Terra Frazier, a child abuse pediatrician, examined C.B. The results were normal. But Frazier expected no injuries from mouth-to-genital or hand-to-genital contact.

The State charged Dickerson with aggravated indecent liberties with a child, a severity level 3 person felony; and criminal sodomy, a severity level 3 person felony, occurring on or about May 1, 2014, to May 31, 2014. In March 2015, the State amended

3

the Information, changing the date range of the offense to April 1, 2014 to May 31, 2014. This was later extended by one month at the close of evidence at trial.

Dickerson filed a *Daubert* motion to exclude the forensic interview. The court held an evidentiary hearing and found testimony about the forensic interview admissible under the factors listed in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

At the jury trial, Croom, Simpson, Newell, S.S., Z.S., Frazier, Washam, and C.B., among others, testified. Over Dickerson's objection, a video recording of Washam's forensic interview of C.B. was shown to the jury. We offer a brief summary of some of the trial testimony.

C.B. testified to the facts as she had done in the forensic interview. C.B.'s grandmother, Simpson, did not remember the date, but she remembered Jackie calling one night and asking her to bring C.B. over the next day to help around the house. Simpson stated that C.B. had just moved in with her at the end of February or the first of March 2014 and was being home schooled until she could get the paperwork to enroll her in school. Jackie said that Dickerson would be home and C.B. could go to an auction with him and Dickerson would help with her home schooling. Simpson dropped C.B. off at the house in the morning on her way to work and Dickerson was the only person home. After that day, she noticed Dickerson acting differently towards C.B.

The State offered and the court admitted, over Dickerson's objection, screenshots purportedly of a Facebook Messenger conversation in June 2014 between C.B. and Z.S. in which Z.S. told C.B. that S.S. was at camp and Dickerson had S.S.'s phone. Then C.B. sent Z.S. a screenshot of messages she had received the previous day from S.S.'s Messenger account that read "This is Bob" and "Y u tell on me." C.B. knew Dickerson as "Bob" and did not know anyone else named Bob.

4

For the defense, Jackie testified that she had never asked C.B. to come over and do laundry at her house. Jackie testified she had S.S.'s phone while S.S. was at camp, not Dickerson.

S.S. testified that in October 2013, Dickerson found out he and C.B. were having a sexual relationship and Dickerson threatened to break them up if they continued having sex. S.S. testified that C.B. was mad at Dickerson about this and she wanted Dickerson "away somehow." S.S. testified he did not give Dickerson the password to his cellphone.

Dickerson testified on his own behalf and denied the allegations. He also denied having the password to or sending messages from S.S.'s phone.

After the close of evidence, the State moved to amend the Information to allege that the crimes occurred between March 1, 2014, and Memorial Day 2014 (previously it had been between April 1, 2014, and May 31, 2014). The court allowed the amendment, ruling that there was no prejudice to Dickerson because no one was ever able to pin down the date of the incident and his defense was a complete denial that the acts ever happened.

The jury found Dickerson guilty of aggravated indecent liberties, but not guilty of criminal sodomy. The court sentenced Dickerson to 216 months in prison.

We look first at the arguments over the amendment of the Information. After that, we examine the two evidence questions: the forensic interview and the Facebook message. Finally, we analyze the prosecutor's comments.

5

*We see no error in permitting the State to extend the possible date range by one month.*

The parties take opposing positions on this issue. Dickerson contends that the amendment to the Information at the end of trial prejudiced his defense because he was unable to present evidence that he was regularly seeing a doctor in March because he was "being treated for a stroke," or otherwise present alibi evidence. The State contends that Dickerson did not preserve this issue for review by objecting to the amendment at trial and Dickerson suffered no prejudice because witnesses testified his stroke was in April and Dickerson admitted he had been alone with C.B. at some point.

Generally, issues not raised before the trial court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). But we will consider this issue because Dickerson did object to the amendment.

After the State moved for the amendment, defense counsel responded with words that we interpret to be an objection:

> "Your Honor, when I questioned her, she—she couldn't even say what date or what month, when I had her on cross. Now, she had her for six weeks. Our defense isn't that he was crippled and that he didn't, but now they have the opportunity of saying—they go from April to—I mean May to April to March, and she was the one with the car. She testified she was the one that was dropping her off all the time. So I guess if the Court rules against me, I'll be able to argue first they picked April, then they picked May, then they picked March because they never could figure out what day this happened. I mean, now we're down to February or March, and I just say that that is—even though it's before it's submitted to the jury, we've got one person saying April or May, I don't know, who is the victim. And then we got Grandma now comes forward and says, 'Oh, yeah, I looked,' and she said February. And then your notes show March. So that shows she doesn't really know the exact date. And she testifies on recross, I said, 'Name me the date, time, and month,' and she says, 'I can't.' And that was on cross.

6

"So what we're doing here is shotgunning. I mean, we prepared this from April or May, and now we're asked to consider all the way back to February."

While the defense attorney could have been more clear that he was objecting, the objection can be inferred from the statement "if the Court rules against me," and the conversation that followed. The trial court found that Dickerson was not prejudiced by the amendment. We agree.

We review a district court's decision to allow the State to amend the charging document under an abuse of discretion standard. Dickerson bears the burden of establishing this abuse of discretion. See *State v. Holman*, 295 Kan. 116, 145, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

The court may permit a complaint or information to be amended at any time before a verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced. K.S.A. 22-3201(e). Here, the amended Information did not charge an additional crime or a different crime. The amendment dealt only with the date of the offenses. At trial, C.B. did not recall the date of the alleged sexual abuse. Simpson believed the day that C.B. described was two to four weeks after C.B. began living with her. When she testified on rebuttal, Simpson stated that C.B. began living with her at the end of February or the first of March 2014.

The issue boils down to whether Dickerson's substantial rights were prejudiced by the amendment. Caselaw provides us guidance. In *Holman*, like here, the trial court granted the State's motion to amend the charging document to conform to the evidence presented after the defense rested its case. The amendment expanded the time frame by 18 days for the commission of its offense of aggravated indecent liberties with a child. Holman argued the trial court erred because he was often away from home when the

7

offense allegedly occurred and had submitted evidence of his work schedule during the original timeframe. Our Supreme Court reviewed some factors to determine whether the defendant was prejudiced by an amendment. Those factors are whether:

- the date of the offense was a critical or material issue;
- the statute of limitations was involved;
- an alibi was a defense;
- time was an element of the offense;
- the defendant was surprised by the amendment. See *Holman*, 295 Kan. at 146-47.

The *Holman* court noted that crimes involving child victims have some unique qualities:

"In particular, with regard to the charge of indecent liberties with a child, this court has specifically held that '[t]ime is not an indispensable ingredient.' Finally, this court has noted '"it is not unusual for uncertainty as to dates to appear particularly where the memories of children are involved."' [Citations omitted.]" *Holman*, 295 Kan. at 146.

The court found that Holman was aware the date of the offense was uncertain and thus the amendment should not have surprised him. Also, the amendment did not adversely affect an alibi defense. 295 Kan. at 146-47. The court found no error, but did note that it would be better practice for the State to amend the charging document at the close of its case-in-chief, when possible, rather than after the defendant's case-in-chief. 295 Kan. at 147.

Dickerson claims he was unable to present alibi evidence for the month of March—specifically of his stroke. But the record shows that Dickerson's stroke could not have been an alibi during March of that year. According to testimony of both the State

8

and defense witnesses, the stroke occurred in April, not March. Simpson testified that the stroke occurred on April 27, 2014. She had saved a text message she sent to Jackie on that date expressing her sympathy. Jackie testified that Dickerson's stroke occurred on April 26, 2014. Before Dickerson's testimony at trial, defense counsel stated on the record that he had planned to ask to admit Dickerson's hospital records about the stroke, but he decided that Jackie's testimony was sufficient on the stroke and the records "would only, I think, add confusion to the matter."

Like the situation in *Holman*, Dickerson knew the date of this incident was uncertain. After all, the State had already amended the Information one time previously by expanding the possible number of days when the crimes occurred. C.B. was never able to specify a particular date, as we often see in these types of cases.

But, more importantly, the date was not critical to the defense. Defense counsel admitted that "[o]ur defense isn't that he was crippled." And Dickerson admitted that at some point he had been alone with C.B. at his house. His defense was that C.B. fabricated the allegations.

Dickerson also has not shown prejudice. He complains that he could have pursued some other hypothetical alibi but never tells us what that alibi could have been.

Nor are we concerned about the timing of the amendment, coming after Dickerson's case-in-chief. The testimony that C.B. began living with her grandmother as early as possibly February came out during the State's rebuttal. That of course is after the defense had rested. There was no need to amend the Information before that testimony was heard. Considering all of the *Holman* factors, we hold the trial court did not abuse its discretion by permitting the amendment.

9

*Admitting the forensic interview was not legal error.*

Dickerson contends that the Sunflower House interview was scientific or specialized evidence that did not comply with K.S.A. 60-456 because the interview protocol is untestable. He contends "the *interview* did not meet the *Daubert* standards incorporated into K.S.A. 60-456. As a result the *interview* should not have been admitted by the district court and that erroneous admission warrants a new trial." The State contends that even though the interview model was reliable enough to meet the *Daubert* standard, it did not need to admit the interview as expert testimony.

The reasoning used in several cases by recent panels of this court is persuasive. The panels have all recognized that while parties in Kansas may qualify an expert to offer opinion testimony *about* the validity or effectiveness of the interview techniques and protocols used in a child interview, the *interview itself* is not expert testimony. Here, the evidence is a recorded out-of-court statement from a witness available for cross-examination.

The prior panels have reasoned that interviews are not testimony. During the interviews, the interviewer offered no opinion on the veracity of the child's statements or an opinion about whether the child was sexually abused. The interviews were a fact-finding process. Because the interviews were not expert testimony, the panels did not address whether the interviews met the requirements of K.S.A. 60-456(b) and *Daubert*. See *State v. Ballou*, No. 116,252, 2017 WL 3575610, at *10-11 (Kan. App. 2017) (unpublished opinion), *rev. granted* 307 Kan. 988 (2018); *State v. Howling*, No. 116,524, 2017 WL 4561832, at *3 (Kan. App. 2017) (unpublished opinion), *rev. granted* 307 Kan. 990 (2018).

Here, a video of Washam's interview of C.B. was played for the jury. Washam used the National Children's Advocacy Center's interview model. During the interview,

10

Washam offered no opinion on the veracity of C.B.'s statements or whether C.B. was sexually abused. Washam was engaged in fact-finding. Therefore, the forensic interview was not expert testimony subject to K.S.A. 60-456(b).

Because Dickerson challenges the admission only of the *interview* on appeal, our analysis ends here. As we do not interpret Dickerson's argument as a challenge to Washam's testimony at trial about her forensic interview of C.B., we see no need for further analysis. We find no error in the court admitting the interview into evidence.

*The court properly overruled the defense's foundation objection to the Facebook Message.*

At trial, Dickerson objected to the admission of State's exhibits 25 and 26 based on authenticity and reliability. The exhibits were screenshots of messages sent from S.S.'s Facebook Messenger account to C.B. that read "This is Bob" and "Y u tell on me." One of the exhibits was just a larger image of the other. Dickerson complained that it was only speculation that the messages came from him; that it looked like the messages had been tampered with; and that Z.S. brought the screenshot to police. When the court admitted the exhibits, it summarized the testimony from S.S., Z.S., and C.B. on the subject and found there was enough authentication based on all the circumstantial evidence to admit the exhibits.

To us, Dickerson contends the State did not establish that he was the person who sent the Facebook messages or the accuracy of the messages, and thus the district court admitted the exhibits without proper authentication. A brief review of the law is helpful at this point. From this review, we can see that a party seeking the admission of such writings has a small burden of proving authenticity.

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Here, the court's decision on the admissibility of the evidence also requires application of a statutory rule controlling the admission and exclusion of writings. Authentication of a writing is required before it may be received in evidence. Authentication may be by evidence sufficient to sustain a finding of its authenticity or by any other means provided by law. K.S.A. 60-464.

Essentially, the proponent of a writing must show that the message is what it purports to be. The cases say this burden is "minimal" or "slight." Whether a writing has been sufficiently authenticated is a matter for the trial court's discretion and not subject to a precise formula. A writing may be authenticated solely through indirect or circumstantial evidence, including the writing's own distinctive characteristics and the circumstances of its discovery.

Once the proponent has offered sufficient authentication, conflicting evidence about the writing goes to the weight, not the admissibility, of the writing. *State v. Robinson*, 303 Kan. 11, 225-26, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). A trial court's decision whether the authenticity of a writing was established enough is reviewed for abuse of discretion. *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 1195 (2017).

Five cases lead us to hold that the district court properly admitted these two exhibits. They all reflect how small this burden of proof is. First, in *State v. Milum*, 202 Kan. 196, 197-98, 447 P.2d 801 (1968), a handwritten note was delivered by "a trusty" to one of the defendant's alleged accomplices while he and the defendant, Stephen Milum, were incarcerated in the same jail. The note threatened to have him "taken care of" if he testified. It was signed "Steve." The alleged accomplice was unable to identify the handwriting as that of the defendant. But he stated he did not know anyone else in the jail named Steve. The court found that the note's contents and other circumstantial evidence

12

supported a reasonable inference that the defendant had written the note, which was adequate proof of its authenticity and supported its admission into evidence. *Milum,* 202 Kan. at 198.

Second, in *Robinson*, our Supreme Court held the State properly authenticated e-mail messages purportedly between the defendant and a friend of one of defendant's murdered victims. In the messages, the defendant posed as the victim. The friend testified that based on her independent recollection, the exhibits were printouts from her home computer of e-mails she received from and sent to the defendant when he was posing as the victim. She testified that the messages were accurate and she did not alter them. The court also noted that other circumstantial evidence corroborated the friend's testimony including that the content within each e-mail message was logically connected to the others and reflected an ongoing exchange or dialogue between the parties. 303 Kan. at 226-27. Again, circumstantial evidence led to the admission of the messages.

Third, in *State v. Winder*, No. 98,036, 2008 WL 3367575 (Kan. App. 2008) (unpublished opinion), the defendant acknowledged that certain text messages originated from his cell phone, but he complained that the State failed to establish that the defendant sent the messages. A panel of this court held that sufficient evidence was presented because the text messages came from the defendant's cell phone and one of the messages referred to a previous conversation between the defendant and the witness. And the court concluded that any doubt that the defendant sent the text messages went to weight rather than admissibility. 2008 WL 3367575, at *4.

Fourth, in *State v. Jones*, No. 109,027, 2014 WL 802022 (Kan. App. 2014) (unpublished opinion), the defendant argued the trial court improperly admitted a printout of a Facebook page without establishing that he authored the postings on that page. The defendant admitted the Facebook page was his. But he contended he did not post the material on his page. A panel of this court found there was proper authentication. The

13

court ruled that the content of the posts was consistent with testimony presented by other witnesses. Whether the defendant authored the posts affected the weight of the evidence, not its admissibility. 2014 WL 802022, at *6.

Finally, in *State v. Toole*, No. 116,522, 2017 WL 6395897 (Kan. App. 2017) (unpublished opinion), the defendant argued the State failed to authenticate text messages because there was no evidence the defendant's mother was the person who sent the messages. But a panel of this court noted that "Kansas courts view inconsistencies in the writing, conflicts with other evidence, and whether the proponent of the evidence is correct in their belief regarding authorship of the writing, as questions that influence the weight of the evidence and not the authenticity." 2017 WL 6395897, at *8. The court ruled that the minimal burden of authentication was satisfied by circumstantial evidence from the content of the messages along with the victim's mother's testimony that she had received the messages on her phone from the defendant's mother and that each message was a true and accurate representation of the message she had received. 2017 WL 6395897, at *8.

We see from these cases that admission of messages such as the two here is based on reasonable minimal circumstances. The harder questions deal with what weight to give the evidence. Of course, those questions are for the jury to decide.

Here, C.B. testified on the accuracy of the messages in the exhibits. She testified that the messages "This is Bob" and "Y u tell on me?" came to her in June 2014 from S.S.'s Facebook account. But she believed the messages were written by Dickerson. She knew Dickerson as "Bob" and did not know anyone else named Bob. S.S. recognized that the exhibits were images of his Facebook Messenger account. But he testified he did not write those messages.

Additionally, there was circumstantial evidence that Dickerson had access to S.S.'s Facebook account. S.S. testified that on one occasion, Dickerson had access to his phone. He could not identify when. Z.S. testified that once in 2014, he called S.S.'s phone and Dickerson picked up and said, "I have your brother's phone." That was "around the same time" that C.B. received the Facebook message from S.S.'s account that purported to be from Dickerson. Jackie and S.S. testified that S.S. did not have his cell phone while he was at camp in June.

Based on the reasoning in *Jones* and *Toole* and the other cited cases, we hold the messages were properly authenticated. The circumstantial evidence points us to that conclusion. C.B. testified that the exhibits were accurate representations of the messages she received. S.S. stated that he did not write the messages. The content of the messages and the circumstantial evidence that Dickerson had S.S.'s phone when the messages were sent shows the State satisfied its minimal burden of authentication.

The evidence supported a reasonable inference that Dickerson wrote the messages, which was adequate proof of their authenticity and supported their admission into evidence. Any doubt that Dickerson wrote the messages and any conflicting evidence goes to the weight of the evidence, not the exhibits' admissibility.

As an afterthought, Dickerson also challenges the screenshots' chain of custody because the "only evidence that the messages were accurate were from the accuser and one who had clear dislike for [Dickerson]." But again, that is an issue that affects the weight—not the admissibility—of the evidence.

> "A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not

15

been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility." *State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007).

In *Horton*, an officer testified that some objects appeared to be the same objects collected from Horton's car. Thus the trial court properly admitted the objects. 283 Kan. at 62.

Here, the chain of custody was sufficiently established. Z.S. testified he shared the screenshot of the messages with law enforcement officers. Detective Kingston corroborated that Z.S. showed him the messages on his phone as depicted in the exhibits—photographs taken by an officer. There is no error here.

*Taken in context, the prosecutor's comments do not improperly appeal to the jury's sympathies.*

Dickerson contends the prosecutor appealed to the sympathies of the jurors by stating in closing arguments that C.B. had to repeatedly tell "grown men" her allegations. In Dickerson's view, the prosecutor insinuated that C.B. "suffered at the hands of defense counsel." The State contends that the prosecutor was properly arguing that C.B. was credible because of her consistency and it is mere speculation that the prosecutor was referring to defense counsel.

The two-step process for reviewing claims of prosecutorial error requires us to look for error and, if we find it, decide if the error is prejudicial to the defendant. *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 6-7, 378 P. 3d 1060 (2016).

Pertinent here, we note that prosecutors may not make statements calculated to inflame the passions or prejudices of the jury or distract the jury from its duty to decide based on the evidence and the law. Prosecutors must guard against appeals to jurors' sympathies or prejudices. *State v. Hall*, 292 Kan. 841, 853, 257 P.3d 272 (2011).

Here, the "grown men" comment that Dickerson complains about came after the prosecutor told the jurors that C.B. was consistent in telling her side of what happened:

> "[She] . . . has been consistent from Day 1 in talking to a number of people. She's talked to at least eight people you heard about it: Jacob Newell, [S.S.], Z[.S.], Jennifer Washam, her grandmother, her great-grandmother, Dr. Frazier. And now she's come in and talked to thirteen more, and those are you, complete strangers, told you what happened to her. Again, consistent with what she's told everyone all along. Her details are the same. . . .
>
>  . . . .
>
> ". . . She has no motive to make up these allegations. She was together with [S.S.] before and after she told him. She had sex with him before and after. If anyone was hurt by all of this, it was her. She was broken up with—by [S.S.] on June 27th, well after she started to disclose the incident. She didn't want to go to church anymore. She was never able to talk to him again. And obviously she had to go to the doctor, submit to that examination, come to court at least on two occasions you've heard about, *get questioned by grown men* when she's fifteen, tell strangers about her sex life. And yet she's done that over and over again without recanting." (Emphasis added.)

When viewed in context, the prosecutor was making two points. First, C.B. was consistent. Second, she had no motive to make up the allegations. It was proper for the prosecutor to explain the legitimate factors the jury could consider to assess C.B.'s credibility, such as consistency of her statements, and to draw the jurors' attention to specific evidence that corroborated C.B.'s version of events. See *State v. Williams*, 299 Kan. 911, 936, 329 P.3d 400 (2014).

When we look at all of the arguments, the "grown men" comment was benign and isolated. We do not see how the comment could have inflamed the passions or prejudices of the jurors. The comment was not equivalent to the highly emotional pleading for protection of the victim as in other cases. Defense counsel was not one of the people the

17

prosecutor listed that C.B. had to tell her story to. So, clearly, the remarks were not about the attorney.

It is important to note that the prosecutor began her closing argument by telling the jurors not to base its decision on sympathy for any party:

> "[R]]emarks of counsel aren't evidence in the case. And I ask that you keep that in mind for myself and [defense counsel]. I ask that you listen to us carefully, of course, but that when you go back to that jury room and you think [about] what we're saying, you really rely on the evidence that came from the witness stand when you're considering what happened in this case.
>
> . . . .
>
> "Finally, the last instruction the judge read to you tells you to base your decision on the law and the evidence in this case. And that's important because we shouldn't be basing it on sympathy for any party, whether it be the victim or the defendant in this case. We should be focused on the law and the evidence."

In context, the prosecutor's passing reference to C.B. telling her story to "grown men" was not prosecutor error. Since we find no error, we need not determine if the remark was prejudicial—the second step of our analysis.

Finally, because Dickerson has failed to show us any error, we reject his claim of cumulative error.

Affirmed.