CORRECTED OPINION[1]

NOT DESIGNATED FOR PUBLICATION

No. 120,195

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN ELMER GOODPASTURE, JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Opinion filed February 21, 2020. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*Bethany C. Fields*, deputy county attorney, *Kendra Lewison*, assistant county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM:   After appointing a lawyer to represent Defendant John Elmer Goodpasture, Jr. and holding an evidentiary hearing, the Riley County District Court denied his motion for habeas corpus relief from 21 jury verdicts convicting him of sex

[1]**REPORTER'S NOTE**:  Opinion No. 120,195 was modified by the Court of Appeals in an order filed March 25, 2020, in response to defendant's motion for rehearing or modification. A new paragraph has been substituted for a paragraph in this opinion, slip op. at 10, last paragraph.

1

offenses against two minor girls and from the resulting sentences of life in prison. Goodpasture has appealed. We find no error and, therefore, affirm.

FACTUAL AND PROCEDURAL HISTORY

In 2008, Goodpasture was in a relationship with A.H. and moved into her home in Seneca, Kansas. Goodpasture and A.H. each had children from previous relationships, and they had a daughter, I.G., born two years after they got together. Goodpasture's children were older and only occasionally visited their father. A.H.'s two daughters D.H. and G.H., both minors, lived with the couple. Sometimes Goodpasture and A.H. shared their residences with other adults, including Goodpasture's mother or one of A.H.'s sisters. Other times, they were the only adults residing in the homes. During the relevant times, they lived in Seneca and from August 2010 in Manhattan.

In mid-June of 2011, S.L., one of A.H.'s nieces who was then about 11 years old, stayed with the couple in Manhattan. While there, S.L. reported Goodpasture touched her in inappropriately sexual ways. S.L. alleged that, on a recent trip to Salina to pick up Goodpasture's grandson, Goodpasture inserted his finger into her vagina as she dozed in the backseat of the van. According to S.L., Goodpasture then tried to kiss her on the mouth and placed her hand on his clothing over his crotch. When S.L. moved to another seat in the van, Goodpasture told her not to tell anyone. S.L.'s report prompted a police investigation.

In a later interview with law enforcement officers, S.L. said that Goodpasture had inappropriately touched her on other occasions in the Manhattan home and in the Seneca home during the summer of 2010. At Goodpasture's criminal trial, S.L. did not provide particularly detailed testimony about those incidents. But the State played her recorded police interview for the jury.

After S.L.'s report, law enforcement officers interviewed D.H. D.H. initially denied Goodpasture acted inappropriately with her, but later she told police Goodpasture had sexually molested her for several months in both the Seneca and Manhattan homes. D.H. provided a detailed account of the first incident and more generally described other incidents. D.H. stated that she did not come forward to report the inappropriate conduct because Goodpasture threatened to cut her throat in front of her sister. D.H. told investigators she believed Goodpasture was capable of carrying out that threat.

D.H. recounted a trip to the store with Goodpasture, who wanted to pick up some beer. On the way to the store, Goodpasture stopped the car and required D.H. to touch his penis over his clothing. D.H. related that Goodpasture sexually penetrated her almost every time her mother left her at home with Goodpasture. Sometimes, D.H.'s baby sister remained in the house.

According to D.H., Goodpasture last abused her about two weeks before his arrest. During that assault, Goodpasture put his penis in D.H.'s mouth. D.H. got up and went to the bathroom to rinse out her mouth. Goodpasture then grabbed her, pushed her onto the bed, and penetrated her vagina with his penis. Afterward, when Goodpasture went to use the bathroom, D.H. ran to her bedroom and shut the door. Goodpasture followed her and again raped her.

D.H. testified that Goodpasture had forced his penis into her mouth on three to five occasions and that he had used sex devices, such as a dildo, to penetrate her three to five times. D.H. testified in detail about one incident involving the sex devices. During the trial, the State also presented a video recording of an investigative interview of D.H.

Over the course of the direct criminal case, the State amended the charges against Goodpasture several times. In its final version, the complaint charged Goodpasture with 5 counts of sex crimes against S.L. and 16 counts of sex crimes against D.H., including rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. All of

3

the charged crimes were off-grid felonies carrying life sentences. At the conclusion of a 5-day trial, the jury convicted Goodpasture of all 21 counts. The district court denied Goodpasture's posttrial motions and sentenced him to serve 2 consecutive life sentences plus 19 concurrent life sentences without the possibility of parole for 25 years on each count.

Goodpasture filed a direct appeal. His appointed counsel raised three arguments on appeal. We affirmed Goodpasture's convictions and sentences, and the Kansas Supreme Court declined to review our decision. See *State v. Goodpasture*, No. 110,445, 2014 WL 6490223 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1015 (2015).

On January 27, 2016, Goodpasture filed a motion for habeas corpus relief under K.S.A. 60-1507, alleging multiple grounds of ineffective assistance by the lawyers who represented him in the district court and on appeal in the direct criminal case. After reviewing the 60-1507 motion and the underlying criminal case file, the district court appointed Joseph Desch to represent Goodpasture. Desch filed a clarifying statement with the district court identifying six allegations of ineffective representation by the lawyers defending the criminal case in the district court and six allegations of ineffective representation by the lawyer handling the appeal. Goodpasture eventually waived the claims of ineffective assistance by Larry McRell, who first represented him in the district court. At the evidentiary hearing, Goodpasture waived additional claims. After the three-day hearing, the district court filed a lengthy written order denying Goodpasture's 60-1507 motion. Goodpasture has timely appealed the district court's rulings. In this appeal, Goodpasture jettisoned the remaining claims regarding Bobby J. Hiebert, Jr., who handled the appeal of the direct criminal case. The only remaining claims of ineffective representation concern Gene Parrish, who represented Goodpasture leading up to and during the trial.

4

A prisoner in state custody may collaterally challenge a conviction or sentence on constitutional grounds under K.S.A. 60-1507(a). When, as here, the district court grants the movant an evidentiary hearing on his or her claims, an appellate court applies a mixed standard of review. The district court's factual findings are reviewed for substantial competent evidence in support. An appellate court gives great deference to the district court's findings and does not reweigh evidence, make credibility determinations, or resolve conflicting evidence. Once the underlying facts are established, an appellate court conducts plenary review of the district court's legal conclusions. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

In this appeal, Goodpasture identifies six ways he contends Parrish inadequately represented him in the criminal case: (A) the failure to object to the admission at trial of S.L.'s pretrial recorded interview; (B) the failure to object to the admission of DNA evidence; (C) the failure to present a defense case; (D) the failure to conduct a reasonable pretrial investigation; (E) the failure to call defense witnesses; and (F) the failure to call Amy (Goodpasture) Armstrong (Goodpasture's adult daughter) and Gail Perdue (Goodpasture's mother) as defense witnesses. Some of the issues overlap, and some have been framed generically rather than with great precision. In addressing the arguments, we consolidate some of them in our analysis to unite the discussion of legal points dependent on common facts.

*Guiding Legal Principles*

To prevail on a 60-1507 motion, a convicted defendant must show both that his or her legal representation fell below the objective standard of reasonable competence guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there is "a reasonable probability" the outcome in the criminal case would have been different. *Strickland v. Washington*,

466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014); see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3-4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance). A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694. The movant, then, must prove both constitutionally inadequate representation and sufficient prejudice attributable to that representation to materially question the resulting convictions.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer had made reasoned strategic decisions bears on the competence component of the *Strickland* test.

Regardless of the inadequacy of legal representation, a 60-1507 motion fails if the movant cannot establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test without assessing the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's legal representation fell below the Sixth Amendment standard, he or she is not entitled to habeas corpus relief if the result would have been no different with competent counsel.

6

With those principles in mind, we turn to the points Goodpasture has raised.

*Admission of S.L.'s Recorded Statement*

Goodpasture challenges Parrish's failure to object to the admission of S.L.'s video-recorded statement to law enforcement under K.S.A. 22-3433. Some further background is necessary to understand the context of Goodpasture's argument.

As we have indicated, McRell initially represented Goodpasture in the criminal case. When the State sought to admit S.L.'s recorded statement under K.S.A. 22-3433, McRell did not oppose the motion, and the district court ordered that the video-recorded statement of S.L. was admissible at trial. The district court later appointed Parrish to replace McRell.

K.S.A. 22-3433 permitted the admission of recorded statements of crime victims younger than 13 years of age in criminal proceedings under certain circumstances. The Legislature repealed the statute on April 15, 2010, after many of the criminal acts charged against Goodpasture but before his trial. L. 2010, ch. 90, § 3. This court has previously ruled that K.S.A. 22-3433 applied to any trials occurring *before* its repeal. See *State v. Hudson*, No. 109,892, 2014 WL 3731958, at *2 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1015 (2015); *State v. Waddell*, No. 100,517, 2011 WL 767836, at *3 (Kan. App. 2011) (unpublished opinion). The clear implication is that K.S.A. 22-3433 would not apply in criminal trials occurring *after* its repeal. Accordingly, K.S.A. 22-3433 should not have been used as a procedural vehicle for the admission of S.L.'s recorded statements.

Although S.L.'s statements should not have been admitted under K.S.A. 22-3433, it is questionable whether Goodpasture can establish deficient representation by Parrish for failing to object to the admission of S.L.'s recorded statement. Parrish did not concede the admissibility of the evidence through K.S.A. 22-3433. McRell did that. And while

7

Parrish may not have been irrevocably bound by the district court's ruling, his position at trial was different from defense counsel objecting at trial to preserve an adverse pretrial ruling. See *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016) ("Even when the district court rules on the admissibility of evidence pretrial, a party must still make an objection at trial before the admission of the evidence because the unfolding of a case may require a reevaluation of the reasons for the initial ruling."). Through McRell, Goodpasture had essentially waived any objection to the State's anticipated admission of the evidence under K.S.A. 22-3433. See *State v. Laturner*, 289 Kan. 727, 739, 218 P.3d 23 (2009) (attorney may waive a criminal defendant's right of confrontation). Parrish would probably have had to file a separate motion before trial, seeking to revisit the earlier district court ruling rather than simply objecting at trial to preserve error.

Although Parrish did not specifically testify at the 60-1507 hearing that he strategically opted against resurrecting the ruling on the K.S.A. 22-3433 issue before trial, he explained that he believed the taped interview would be admissible after S.L. testified, notwithstanding a successful argument that the tape could not be admitted under K.S.A. 22-3433. He also indicated he believed that, to the extent the recorded testimony was consistent with S.L.'s trial account, it would not do significant harm to the defense and, to the extent it was inconsistent, it would aid the defense. This testimony indicates Parrish considered raising the issue at trial and made a deliberate decision against doing so. In other words, Parrish made a strategic decision against rearguing the admissibility of S.L.'s recorded statement.

> "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying

8

a heavy measure of deference to counsel's judgments.'" *State v. Coones*, 301 Kan. 64, 74-75, 339 P.3d 375 (2014) (quoting *Strickland*, 466 U.S. at 690-91).

Even decisions left to lawyers in developing and implementing trial strategy must be objectively reasonable under the circumstances. See *State v. Cheatham*, 296 Kan. 417, 446, 292 P.3d 318 (2013) (holding that defense counsel's disclosure of damaging facts that would not otherwise have been disclosed to the jury did not constitute an objectively reasonable trial strategy). Parrish's decision about the taped statement fits within the broad reach of objective reasonableness, given his studied conclusion the evidence would be admissible independent of K.S.A. 22-3433.

The Kansas Supreme Court provided some guidance on this question in *State v. Martinez*, 290 Kan. 992, 1001, 236 P.3d 481 (2010). Contrary to Goodpasture's position, the defendant in *Martinez* argued that K.S.A. 22-3433 applied but that the State had failed to comply with the procedural requirements. In addition to arguing that it had substantially complied with the statute, the State argued that the statements were admissible under K.S.A. 2009 Supp. 60-460(a). The *Martinez* court rejected the argument, not because K.S.A. 60-460(a) failed to authorize the admission of such statements but because K.S.A. 22-3433 was the more specific provision. To the extent it applied, its procedural requirements governed over the more general requirements of K.S.A. 60-460(a). *Martinez*, 290 Kan. at 1001.

Goodpasture has never contended that the State failed to meet the procedural requirements for admission of S.L.'s recorded statements under K.S.A. 22-3433. He has always argued that K.S.A. 22-3433 was inapplicable to admit the statements because it had been repealed before his trial. Assuming K.S.A. 22-3433 were inapplicable, *Martinez* suggests that K.S.A. 60-460(a) would preclude any hearsay objection to the tape, particularly after S.L. testified at trial.

K.S.A. 2018 Supp. 60-460(a) provides:

9

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

"(a) *Previous statement of persons present*. A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

If a witness is available and subject to cross-examination about prior statements, K.S.A. 2018 Supp. 60-460(a) does not differentiate between prior consistent statements and prior inconsistent statements. Goodpasture does not dispute that S.L. was present for trial and subject to cross-examination. He does contend that S.L.'s recorded statement was offered through Detective Ryan Runyan, after S.L. had finished testifying and was no longer available for cross-examination. But this argument is misplaced. The question before us is whether S.L.'s recorded statements *could have been* properly admitted without relying on K.S.A. 22-3433. And to reiterate, K.S.A. 60-460(a) precluded any hearsay objection Parrish might have lodged. Goodpasture now makes no compelling argument otherwise.

Goodpasture does not contend that the admission of S.L.'s out-of-court statements offended the cumulative evidence rule. See *State v. Kackley*, 32 Kan. App. 2d 927, 934-35, 92 P.3d 1128 (2004) (State may present the pretrial statements of child victims of sex crimes that are consistent with their trial testimony). Rather, Goodpasture objects to the admission of S.L.'s recorded statements because they were not only inconsistent with her trial testimony but ostensibly included inculpatory details omitted from her testimony. The argument is unavailing. Out-of-court statements of a testifying witness are substantive evidence, and a fact-finder may consider them for the truth of the matters asserted. The Kansas appellate courts have recognized convictions to be legally sufficient when evidence essential to the State's case consisted of out-of-court statements of a recanting witness. See *State v. Wise*, 237 Kan. 117, 120, 697 P.2d 1295 (1985); *State v.*

10

*Fisher*, 222 Kan. 76, 79, 563 P.2d 1012 (1977); *State v. Labroi*, No. 105,730, 2012 WL 4937458, at *5-6 (Kan. App. 2012) (unpublished opinion). A fact-finder has the prerogative to accept a witness' out-of-court statements as credible and his or her courtroom testimony as not.

Goodpasture has not established to a preponderance of the evidence that Parrish's choice not to revisit the court's K.S.A. 22-3433 ruling was objectively unreasonable under the circumstances. Even if the district court had concluded Parrish's representation was deficient in failing to seek reconsideration of the applicability of K.S.A. 22-3433, Goodpasture has not established a reasonable probability that the recorded statement of S.L. would otherwise have been inadmissible at trial. He cannot, therefore, establish the requisite prejudice to succeed on a claim of ineffective assistance of counsel under the *Strickland* test.

*DNA/Physical Evidence*

Goodpasture next contends that Parrish provided deficient representation in failing to object to the admission of the sex devices and the DNA evidence taken from them. The basis for this appellate argument is less than entirely clear. Goodpasture appears to challenge the district court's ruling that any argument related to Parrish's failure to seek suppression of the sex devices was untimely because it did not relate back to the filing date of the 60-1507 motion and, thus, fell outside the one-year time limit in K.S.A. 60-1507(f); but the briefing focuses on an argument based on the chain-of-custody of the evidence.

*1. Suppression of Sex Devices*

At the 60-1507 hearing, Desch requested permission to amend the 60-1507 motion to add an allegation of ineffective assistance of counsel because Parrish failed to seek suppression of the sex devices based upon an illegal search of the residence. The district

11

court ultimately denied the request, finding that the claim was untimely, that it did not relate back to any of the claims raised in Goodpasture's 60-1507 motion, and that Goodpasture could not establish manifest injustice to warrant the untimely consideration of the issue.

To the extent Goodpasture is challenging the district court's ruling on the requested amendment, the issue, as presented, does not provide a basis for reversing Goodpasture's convictions. First, Goodpasture does not explain how the district court's conclusion about the timeliness of the amendment is error. He provides no argument that the issue properly related back to some issue he raised in his motion. In passing, he contends that the suppression issue is encompassed by the following statement in his motion: "Counsel should have motioned to suppress any non-factual evidence relating to the sexual devices that were never used for sex, to prove a sexual crime with them." But nothing in this statement suggests that the seizure of the sex devices violated Goodpasture's Fourth Amendment rights—the argument he sought to present at the 60-1507 hearing. As Goodpasture concedes, the context of the statement establishes that Goodpasture was challenging Parrish's failure to obtain DNA experts to challenge the conclusions the State was drawing from the existence of D.H.'s DNA on the sex devices, not that the sex devices were obtained in violation of the Fourth Amendment.

A pro se pleading is liberally construed to give effect to substance rather than form. See *State v. Kelly*, 291 Kan. 563, 565, 244 P.3d 639 (2010). But even a pro se litigant is held to some degree of specificity when alleging bases for relief under K.S.A. 60-1507. See *Pabst v. State*, 287 Kan. 1, 25, 192 P.3d 630 (2008) ("[The language of Kansas Supreme Court Rule 183] calls for specificity in the manner in which the movant claims ineffective assistance of counsel."). The quoted general statement does not meet this level of specificity. Goodpasture presents no manifest-injustice argument warranting an extension of the time limitation of K.S.A. 60-1507(f) to encompass his new suppression claim. See *State v. Holt*, 298 Kan. 469, 480, 313 P.3d 826 (2013) (movant has duty to provide specific factual foundation to support claim of manifest injustice).

12

Second, even if Goodpasture could have raised the suppression issue in this appeal, he has failed to argue the point and has provided no authority to support a claim for relief. See *State v. Williams*, 308 Kan. 1439, 1456, 430 P.3d 448 (2018) ("Williams does not fully explain his argument about the United States Constitution and fails to support it with any authority. We consider the point abandoned.").

Finally, Goodpasture cannot demonstrate that his substantive argument for suppression would have succeeded had Parrish presented it leading up to the trial. He premises the suppression argument on the testimony of Detective Runyan at the 60-1507 hearing. Runyan testified that he entered the residence to seize the sex devices with the consent of D.H.'s aunt. Runyan admitted that the aunt was not a resident, but he indicated that the aunt was packing up A.H.'s belongings with her permission in preparation of A.H.'s move out of the residence. At the time, Goodpasture was in jail, and A.H. had been hospitalized. Accordingly, the district court found that from the perspective of a reasonable law enforcement officer, the aunt had actual or apparent authority to permit the search of the residence and seizure of the sex devices. See *State v. Boggess*, 308 Kan. 821, 827-29, 425 P.3d 324 (2018).

While the State bears the burden of proving the legality of a search or seizure when a motion to suppress is filed, Goodpasture bears the burden in this proceeding to establish that a motion to suppress might have produced a different result at trial. On this record, Goodpasture has not demonstrated a reasonable probability that the suppression motion, if filed, would have been successful. So even if Parrish's failure to seek suppression had been preserved for the 60-1507 hearing, the point would not have yielded any relief.

*2. Chain of Custody*

In his pro se motion, Goodpasture raised several purported deficiencies in how Parrish addressed the DNA evidence obtained from the sex devices. In the 60-1507 motion, Goodpasture alleged that D.H. or one of her relatives could have deliberately contaminated the sex devices with D.H.'s DNA in an effort to frame him for crimes that never happened. Desch characterized this as a chain of custody problem. It isn't.

> "A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered *since the object was taken into custody*. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility." (Emphasis added.) *State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007) (citing *State v. McGhee*, 226 Kan. 698, 703, 602 P.2d 1339 [1979]).

Goodpasture's argument does not entail the chain of custody—that is, the State's ability to show that evidence offered at trial is in substantially the same condition as when it came into the State's possession. Typically, the prosecution will have State agents who handled or stored the evidence testify about those processes and the condition of the evidence, thus establishing the "chain" of custody. Goodpasture contends D.H. or someone else in her family doctored the evidence before turning it over to law enforcement investigators. He offers a lot of speculation and a dearth of evidence to support that notion. But the very allegation fails to outline a deficiency in the chain of custody. In short, Goodpasture has not accused any State agents of tampering with or mishandling the evidence. His theory that the victims or their family framed him is an entirely different line of attack that really goes to the underlying reliability of the evidence in the first instance and not to its condition after the State took custody of it.

14

In the interest of completeness, we point out that Parrish can't be faulted for not advancing Goodpasture's unfounded speculation about the DNA contamination of the sex devices during the trial. First, of course, it's hardly obvious who could actually testify to even a faint factual outline of the idea. And to present the notion to the jury as an argument without an anchor in the evidence would likely be both improper and highly ineffective. The lawyers' arguments to the jury must be anchored in the admitted evidence and cannot outstrip reasonable inferences drawn from that evidence. Moreover, jurors properly would view such an argument, without some evidentiary support, to be farfetched to say the least and something approaching a desperation tactic that backhandedly would bolster the State's evidence for that very reason.

*Failure to Conduct an Adequate Investigation*

Goodpasture contends Parrish provided constitutionally deficient representation by failing to conduct an adequate investigation. He points to what he characterizes as multiple inconsistent statements or recantations of the victims and refers to the testimony of Detective Julia Goggins, an affidavit of Runyan, and an e-mail from one of the prosecutors to McRell to support the claim. He also mentions Parrish's failure to investigate potential defense witnesses, specifically Goodpasture's daughter and mother.

Goodpasture's contentions are perfunctorily briefed. He failed to include cites to where in the appellate record the evidence may be found, apparently expecting this court to comb the record for any evidentiary support. See *State v. Kettler*, 299 Kan. 448, 465, 325 P.3d 1075 (2014) ("Appellate courts 'will not independently search the record and guess which specific facts [appellant] believes support his general allegations.'"); *State v. Bollig*, No. 115,408, 2018 WL 1976689, at *20 (Kan. App. 2018) (unpublished opinion) ("An appellate court is not, however, obligated to search the record, even cursorily, when a party provides an inadequate reference or citation.").

15

In addition, Goodpasture fails to connect Parrish's allegedly inadequate investigation with the result of his criminal trial. Under the *Strickland* test, it is insufficient to claim that a defense attorney inadequately investigated the case. The movant must also establish that, had a sufficient investigation been done, the lawyer would have discovered evidence that would have advanced a colorable defense. See *State v. Lindsey*, No. 116,971, 2018 WL 4655960, at *15 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1352 (2019); *Haskin v. State*, No. 90,252, 2004 WL 292113, at *1 (Kan. App. 2004) (unpublished opinion). Goodpasture renders a conclusion that an adequate investigation would have changed the outcome of his trial without specifically explaining how the evidence obtained through his vision of an adequate investigation would have influenced the jury's consideration of what actually had been presented during the trial.

Despite the inadequate briefing on these points, we endeavor to address the contentions to afford Goodpasture his due and then some. On appeal, Goodpasture divides Parrish's ostensible investigatory inadequacies into two categories: (1) potential witnesses that he failed to discover before trial; and (2) witnesses whose testimony he did not adequately consider.

*1. Undiscovered Witnesses*

Of the undiscovered witnesses, Goodpasture identifies (a) an affidavit of Detective Julia Goggins, describing an interview with S.L. shortly before the trial date; (b) evidence of D.H.'s recantation shortly before trial in e-mail correspondence from Kendra Lewison, one of the prosecutors, to McRell; and (c) impeachment material in an affidavit of Detective Runyan.

16

*a. Det. Goggins*

Detective Julia Goggins testified at the 60-1507 hearing about interactions she had with both D.H. and S.L. From the general allegations provided in Goodpasture's appellate brief, it is not clear what testimony Goodpasture submits Parrish should have elicited from Goggins at trial. We, therefore, survey her testimony about each of the victims, beginning with S.L.

On July 26, 2012, shortly before Goodpasture's criminal trial began, the prosecutors met with S.L. and her mother at the courthouse in Seneca. Goggins was also present to observe and take notes. S.L. initially did not want to talk about her accusations against Goodpasture. Goggins took S.L. into the empty courtroom, while the prosecutors spoke with S.L.'s mother. Goggins established a rapport with S.L., and S.L. eventually told Goggins that she would speak about the allegations. The two of them returned to the interview room, where S.L. described how Goodpasture had sexually abused her. Goggins prepared a short affidavit to memorialize the interview with S.L.

Goggins' affidavit was not provided to Parrish before the trial. When he discovered Goggins' affidavit after Goodpasture's trial, Parrish filed a motion for new trial. The district court denied the motion.

On appeal, Goodpasture does not articulate the basis for finding Parrish's representation to be deficient with respect to Goggins' testimony. A defense lawyer would not necessarily be expected to attempt to interview every law enforcement officer involved in a case or even those communicating in some manner with a putative victim. More to the point here, even if Parrish could be faulted in not attempting to talk to Goggins before trial, Goodpasture cannot demonstrate prejudice. Assuming Goggins' trial testimony would have matched her testimony at the 60-1507 hearing, Goggins' testimony regarding S.L. would not have altered the course of the trial. Goggins explained that S.L.

17

seemed to be reticent to talk about the abuse in the meeting with the prosecutors—not that she changed her account. Goggins concluded S.L. may have been intimidated by the number of adults who she did not really know and the courthouse location. After S.L. became comfortable with Goggins, she described the abuse consistently with her earlier accounts. We fail to see how testimony of that tenor from Goggins would have changed the trial's outcome.

At trial, D.H. admitted that she initially told the police that Goodpasture had not sexually abused her. D.H. also admitted to recanting shortly before trial during an interview with the prosecutor. But, of course, she testified under oath to the jury that Goodpasture had sexually assaulted her multiple times. At trial, D.H. explained that she did not feel safe disclosing the sexual abuse until Goodpasture was put in jail and initially disclosed the abuse only to people she trusted. D.H. told the jury that the allegations caused tensions and fights among members of her family.

As we discuss, Parrish was aware of those recantations in advance of trial, and the jury heard about them from D.H. herself, along with her explanation about why she denied the abuse. Although Goggins could have confirmed that D.H. recanted the allegations she made against Goodpasture, we don't see that as adding much to what the jury knew. D.H. never denied uttering the recantations. The question for the jury was which of D.H.'s statements were truthful—the abuse allegations or the recantations of them. Goggins' testimony would have shed little, if any, light on the correct answer.

### b. Lewison E-mail to McRell

On January 13, 2012, Kendra Lewison sent McRell an e-mail message detailing her interactions with D.H. on November 2, 2011. In the conversation with Lewison, D.H. recanted many of her allegations of sexual abuse against Goodpasture and provided various reasons for her supposedly false reports. McRell withdrew from representation of Goodpasture on February 2, 2012.

18

Since Desch did not question Parrish about this e-mail at the 60-1507 hearing, Goodpasture's argument on appeal does not clearly articulate the manner in which Parrish's representation may have been deficient. Nothing in the record suggests that Parrish's failure to use this information at trial was the product of an inadequate investigation. At the time the State disclosed the exculpatory evidence, McRell represented Goodpasture. It's hardly clear McRell conveyed the information to Parrish, and Goodpasture has waived any claim of ineffective assistance of counsel against McRell.

Without receiving the e-mail, Parrish would have had no reason to ask Lewison before trial specifically about exculpatory information in the State's possession, since she had a continuing duty to disclose exculpatory information to the defense. Lewison had done so. If Parrish were aware of the e-mail before trial, his failure to cross-examine D.H. about recantation to the prosecutor might be open to question. Even so, the failure could not be considered particularly significant. During the trial, the prosecutor specifically asked D.H. about the November meeting with Lewison. D.H. admitted that she recanted, offered an explanation for doing so, and reasserted her allegations of sexual abuse against Goodpasture. Parrish could have reploughed that ground on cross-examination, but D.H. likely would have been asked to repeat her explanation on redirect examination. That sort of exchange wouldn't have added materially to what the jury had already learned. Armed with that knowledge, the jury still found the sexual abuse allegations sufficiently credible to convict Goodpasture of 16 sex crimes against D.H. Goodpasture cannot establish prejudice.

### c. Runyan Affidavit

Goodpasture contends Parrish failed to investigate an affidavit from Runyan but does not specifically identify where the document may be found. The only affidavit from Runyan in the record is the one he presented to the district court in support of the warrant

for Goodpasture's arrest. The copy in the record includes notes from Goodpasture indicating possible lines of questions based on the recited facts.

One of these comments pertains to D.H.'s report about the sex devices. Runyan's affidavit states that D.H. said she would place a pink dildo in her vagina, and Goodpasture would turn it on. At trial, D.H. testified that Goodpasture used both the dildo and a vibrator to assault her. Runyan's affidavit does not mention a vibrator. The omission doesn't seem to offer a particularly productive line of inquiry with either Runyan or D.H. in front of the jury, especially since there are myriad benign explanations for the omission.

A more significant contradiction arises from D.H.'s statement reported in Runyan's affidavit that she inserted the dildo herself. If true, that circumstance would be inconsistent with the strict elements of rape, as defined in K.S.A. 21-3502 and codified since 2011 in K.S.A. 21-5503. But during the trial, D.H. testified that Goodpasture inserted the dildo, contrary to what Runyan included in the affidavit. The apparent conflict would have opened D.H. up to impeachment. But she might have diffused the line of inquiry by suggesting the affidavit to be in error. Challenging D.H. on this point would not have been a devastating attack on her credibility and, thus, would not have shifted the tide of the trial.

At the 60-1507 hearing, Desch did not question Parrish about the discrepancies between Runyan's affidavit and D.H.'s trial testimony. Since there would have been acceptable strategic reasons for not attacking D.H. with those purported inconsistencies, we should not simply presume that Parrish's failure to do so was the result of deficient representation. See *Burt v. Titlow*, 571 U.S. 12, 22-23, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013). In other words, when a defendant has the opportunity to examine a former lawyer in an evidentiary hearing, such as on a 60-1507 motion or in a *Van Cleave* proceeding, about strategic considerations bearing on how particular aspects of the case were handled and then *does not* inquire, the presumption of reasonable representation may be sufficient

20

to overcome a claimed deficiency, so long as some acceptable strategy may be hypothesized for the challenged conduct.[*]

[*]The approach does not suffice in a summary denial of a 60-1507 motion without an evidentiary hearing. In a summary disposition, the lawyer cannot be asked about why he or she handled the case in a specific ways. So a particular action or inaction might be the result of a reasoned strategy or an inferior investigation of the law or the facts or just plain inadvertence. See *Miller v. State*, 298 Kan. 921, 933, 318 P.3d 155 (2014) ("mistake of oversight" is not strategy). The presumption of reasonableness does not adhere in that situation. It applies to actual strategic choices, so a lawyer may not be faulted under *Strickland* for selecting one reasoned strategic approach over others, even though the particular selection might be questioned. But the motion may still be denied, if the defendant cannot establish prejudice under the second component of the *Strickland* test. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

In short, despite the opportunity to do so during the evidentiary hearing, Goodpasture never established that Parrish's failure to impeach D.H. with these inconsistent statements was a product of a lack of investigation rather than a reasoned trial strategy. So absent evidence to the contrary, we must presume Parrish rendered Goodpasture constitutionally effective representation in this respect.

*S.L.'s Purported Declaration of Intent to Make False Accusations*

Turning to a different aspect of D.H.'s pretrial statements, Parrish was aware that D.H. purportedly had said she overheard S.L. discussing making false accusations of sex abuse against Goodpasture. Parrish attempted to cross-examine D.H. about the conversation at trial. The State objected. The district court ruled that the examination was properly conducted during the defense case-in-chief rather than on cross-examination and that the inquiry had to be limited to S.L.'s statements that Goodpasture did not molest her or that S.L. intended to fabricate abuse claims. Parrish did not recall D.H. as a witness as part of the defense case.

21

D.H. had purportedly made the statement about S.L. in an interview with Goggins. In that interview, D.H. reportedly told Goggins that she did not believe S.L.'s allegations against Goodpasture and related a story about overhearing some girls, including S.L., talking about fabricating accusations against Goodpasture.

Because Parrish was aware of the conversation between Goggins and D.H., any allegation that he failed to conduct a sufficient investigation appears well off the mark in showing some kind of deficient representation. Parrish might have called Goggins as a witness at trial. But the detective presumably would not have been able to provide any more specific testimony than D.H. told her that she overheard a conversation some girls had about Goodpasture. Goggins' knowledge of the conversation is entirely indirect and wholly dependent on D.H.'s knowledge. Goodpasture cannot establish that Parrish fell below the constitutional standard of adequate representation in failing to call Goggins for this purpose or that the failure so compromised the defense that the result would have been different had Goggins testified on this point.

In a similar vein, Goodpasture faults Parrish's handling of what purported to be a recording of S.L. admitting she lied in making the accusations of sex abuse. Parrish failed to get the recording admitted as evidence at the trial.

At some unspecified date before the trial but presumably after S.L. first voiced her accusation against Goodpasture, D.H. used her phone to record a conversation between herself and another person, possibly S.L., in which D.H. asked whether Goodpasture had molested the other person. The response is indistinct, but Goodpasture takes it to be something in the negative, i.e., "No" or "Nope." The actual phone conversation is prefaced by someone saying, "Saturday."

At the 60-1507 hearing, D.H. identified her voice on the tape and testified that the voice introducing the recording was Amy Armstrong's. She stated that the voice providing the reply to her question might have been S.L.'s, but she could not remember

22

with certainty the identity of the person to whom she posed the question. Armstrong denied that it was her voice introducing the phone conversation on the recording. Armstrong was able to identify D.H.'s voice on the recording but did not know S.L. well enough to identify her voice. S.L. testified that she could not identify any of the voices on the audio recording and did not recall a conversation in which D.H. asked her whether the allegations against Goodpasture were true. During the trial, S.L. did recall that D.H. asked about her allegations against Goodpasture. S.L. testified that she told D.H. they were true.

Given this testimony at the 60-1507 hearing coupled with what S.L. told the jurors, Goodpasture cannot demonstrate that Parrish provided deficient representation for failing to admit the audio recording at trial. The rather jumbled testimony fails to establish even a semblance of an evidentiary foundation that the voice responding to D.H. was S.L. See *State v. Coones*, 301 Kan. 64, 73, 339 P.3d 375 (2014); 29A Am. Jur. 2d Evidence § 1174 (to admit voice recording as evidence, foundational witness must have basis to connect voice to person identified as speaker). And the conversation would have no relevance except to impeach S.L.'s allegations of sexual abuse. None of the witnesses Parrish could have called to lay a foundation for the recording's admission could identify the speaker who purportedly denied the truth of the allegations against Goodpasture. Without establishing that the speaker was S.L., Parrish could not have successfully offered the recording as trial evidence. Lawyers do not fall below the constitutional standard for adequate representation because they decline to undertake futile efforts or advance empty legal arguments.

*Inadequate Investigation of Known Witnesses*

Goodpasture contends that Parrish conducted an inadequate investigation of two known defense witnesses—Amy Armstrong, his daughter, and Gail Perdue, his mother— and they would have materially advanced his defense. Goodpasture also contends that

Parrish provided deficient representation in failing to sequester the two during the trial, so they could be called as defense witnesses.

If Parrish conducted an inadequate investigation of these two witnesses and failed to learn the scope of their potential testimony, his decision not to call them during the trial could not have been based on complete information and could not be characterized as an objectively reasonable trial strategy. To the extent that their testimony might have changed the outcome of the trial, Parrish's failure to sequester them would constitute ineffective assistance of counsel, since that likely would have precluded calling them as witnesses. Conversely, if Parrish understood what testimony they could offer but decided that the risk of calling them outweighed any benefit to the defense, the decision against calling them would have been a reasonable trial strategy, satisfying the *Strickland* test. See *Coones*, 301 Kan. at 70. Parrish's failure to sequester individuals he did not plan to call as witnesses is not objectively unreasonable and, therefore, would not constitute deficient representation. Goodpasture's characterization of Parrish's deficiencies in weighing the strength of these witnesses' testimonies suggests that he is challenging a strategy decision with the benefit of hindsight.

### 1. Amy (Goodpasture) Armstrong

At the 60-1507 hearing, Armstrong testified that she was prepared to testify at her father's trial. Armstrong asserted that D.H. was not afraid of Goodpasture, as evidenced by D.H.'s physical attacks on Goodpasture. Armstrong was prepared to testify at trial that her room was adjacent to D.H.'s bedroom and that she never heard anything consistent with the sexual abuse D.H. alleged. She also said D.H. told her on several occasions that the allegations of sexual abuse were untrue and that the prosecutors and family members pressured her into making the accusations.

Because Parrish testified before Armstrong at the 60-1507 hearing, he was not asked about most of Armstrong's testimony. Without specifically being questioned about

his knowledge of Armstrong's potential testimony, Parrish provided his reasons for not calling Armstrong as a witness. Parrish explained that he was generally aware that Armstrong had possessed some knowledge about the audio recording D.H. had made with her phone. Parrish also knew that Armstrong had turned over a copy of the recording to the public defender's office. But Parrish did not believe that Armstrong was the best witness to introduce the recording and, therefore, had not planned to call her to testify for that purpose.

Armstrong's testimony at the 60-1507 hearing confirmed Parrish's assessment that Armstrong was not the best witness to introduce the audio recording. Armstrong testified she knew about the tape only because D.H. played it for her and told her that S.L. was the other person participating in the call.

Regarding Armstrong's testimony generally, Parrish expressed reservations about calling Armstrong for the defense because Runyan had documented an interview with Armstrong in which Armstrong told him that she had dreams of her father sexually abusing her and awoke in tears. At the 60-1507 hearing, Armstrong denied having such dreams or telling Runyan that she did.

Nevertheless, that line of cross-examination from the State would not have aided Goodpasture's defense. Armstrong's credibility may have been suspect simply because of her close familial relationship with Goodpasture. Any impeachment based upon Runyan's testimony about the dreams would have been injurious to the defense. In terms of Armstrong's general testimony in favor of Goodpasture, a reasonable attorney faced with balancing the benefits and disadvantages of Armstrong's testimony could have concluded that the potential risks outweighed the benefits. To weigh Armstrong's testimony differently now is to invoke a form of hindsight analysis based upon the lack of success of the chosen trial strategy.

25

As to Armstrong's specific testimony, the proximity of her bedroom to D.H.'s is immaterial unless D.H. indicated that Armstrong was at home when the sexual abuse occurred. D.H. testified to the opposite. She indicated that the abuse occurred when Goodpasture was alone with D.H. or with only D.H. and his infant daughter, I.G. With respect to Armstrong's testimony about D.H.'s lack of fear of Goodpasture, the evidence was likely inadmissible as speculation. If Armstrong had been able to testify about D.H.'s lack of fear, the State likely would have impeached Armstrong with her admissions that Goodpasture was often violent when he had been drinking and with Armstrong's knowledge about Goodpasture's involvement in a felony murder in Atchison. And Armstrong's testimony verifying that D.H. had recanted her accusations against Goodpasture really added nothing to what the jury already heard on that score. A reasonable attorney in the position of Parrish might have concluded that the potential assistance to the defense was outweighed by the risk of prejudice.

Even if we were to assume Parrish provided deficient representation in deciding against calling Armstrong as a witness, what she outlined at the 60-1507 hearing was not such startling information that the jury would have been moved to acquit Goodpasture as a result.

*2. Gail Perdue*

Perdue testified at the 60-1507 hearing that Parrish told her that he was not going to call her to testify because she was the defendant's mother and the jury would not believe her. Parrish's explanation was a bit more ambiguous. He testified that he did not recall anything of substance that Perdue could have added to the defense. He also expressed concern about his ability to manage her as a witness in front of a jury.

Parrish's assessment that Perdue could have added little to the defense was borne out in her testimony at the 60-1507 hearing. She testified that she had provided Goodpasture's lawyers with several affidavits about things she overheard. She did not

elaborate on the speakers or the content, and the affidavits are not in the record. Without specifics, we cannot say that Parrish provided deficient representation or that declining to call Perdue as a witness resulted in demonstrable prejudice to Goodpasture.

Perdue also testified that D.H. informed her on several occasions that the allegations of sexual abuse were lies. D.H. reportedly told Perdue that the prosecutors and detectives threatened her to encourage her to testify. As we have already noted, that testimony would have added little to what D.H. admitted in her own trial testimony. And Perdue may have come across as a decidedly partisan and vigorous defender of Goodpasture—a demeanor that would tend to inferentially support D.H.'s stated reasons for recanting her accusations.

The decision to call witnesses is a strategic decision left to the professional discretion of trial counsel after consultation with the criminal defendant. See *State v. Butler*, 307 Kan. 831, 853-54, 416 P.3d 116 (2018). In this case, the decision not to call the defendant's mother rests on reasonable strategic considerations.

*Failure to Call Defense Witnesses*

In a conclusory manner, Goodpasture contends Parrish provided deficient representation in failing to call defense witnesses to support impeachment of D.H. and S.L. This claim also should fail for inadequate briefing. See *Kettler*, 299 Kan. at 465; *Bollig*, 2018 WL 1976689, at *20. Unnamed or generically described witnesses who might have offered exculpatory evidence do not advance a credible legal argument in a 60-1507 proceeding. The movant must identify specific persons and establish at the evidentiary hearing what they would have said if called as trial witnesses. See *Robinson v. State*, No. 111,923, 2016 WL 1169381, at *4 (Kan. App. 2016) (unpublished opinion).

Goodpasture has identified Armstrong, Perdue, and Goggins as witnesses who should have been called at trial. To that extent, the issue simply overlaps what we have

27

already discussed and rejected as grounds for relief under K.S.A. 60-1507. Based on each of these witnesses' proffered testimony, Goodpasture cannot demonstrate that Parrish's decision against calling any of them as a witness was objectively unreasonable. Goodpasture also challenges Parrish's failure to recall D.H. and his failure to obtain a trial continuance to call A.H. We consider those arguments.

As previously mentioned, Parrish attempted to cross-examine D.H. about a conversation she overheard and reported to Goggins. The State objected and, after a lengthy discussion out of the presence of the jury, the district court ruled that the line of questioning was improper cross-examination but that Parrish could recall D.H. as a defense witness. The district court, however, set guidelines about the manner in which Parrish could question D.H. about the conversation, noting that the questions called for hearsay. One of those guidelines bore on establishing who stated that she would make up lies about Goodpasture. That speaker could then be called so that the statement would satisfy a hearsay exception. The State then argued that, if the speaker was identified as anyone but S.L., the statement had no relevance to this case. As we have said, Parrish did not recall D.H. as a defense witness.

At the 60-1507 hearing, Desch questioned both D.H. and S.L. about this alleged conversation among the unidentified girls. D.H. testified that she believed S.L. was one of the girls because the conversation prompted D.H. to ask one of the girls about the allegations. D.H. could not recall who she questioned, but she thought it was S.L. D.H., likewise, could not confirm that the voice of the girl on the audio recording was S.L.'s. S.L. did not recall D.H. asking her about the truth of the sexual abuse allegations. She could not identify any of the voices on the audio recording. S.L. did not recall a conversation with other girls at any time about the sexual abuse allegations.

At the time of the 60-1507 hearing, Parrish could not identify a strategic reason against recalling D.H. Based on that admission, this court may conclude that Parrish's failure to recall D.H. was not objectively reasonable. But based on the testimony

28

presented at the 60-1507 hearing, it is doubtful that Parrish could have elicted D.H.'s testimony about the overheard conversation. D.H. could not identify the speaker who articulated the plan to tell lies about Goodpasture. She merely thought that S.L. was present, which prompted her to ask someone, possibly S.L., about the allegations. That testimony would not provide an adequate foundation to attribute the statement about making up accusations to S.L. As we have already discussed without that anchor, the statement had no relevance and would have been inadmissible at trial.

At the time of trial, A.H. was hospitalized at the Osawatomie State Hospital for a mental breakdown. Parrish did not request a continuance so that he could call her as a defense witness. Parrish was not questioned at the 60-1507 hearing about his reasons for moving ahead with the trial.

A.H. testified at the 60-1507 hearing and acknowledged speaking with detectives before the trial. A.H. said she didn't have much information to provide the investigators or at the hearing because D.H. and she had not been getting along, so D.H. did not confide in her. A.H. further testified that D.H. has never told her that the allegations against Goodpasture were untrue. A.H. testified about the trip to Salina, but she testified to nothing that contradicted S.L.'s description of Goodpasture's assault. A.H. denied the police or prosecutors threatened her with criminal charges or with having her children removed from her custody—contradicting a defense theory about why D.H. made the allegations of sexual abuse.

In short, A.H. did not provide much, if any, support for the defense. Even if Parrish had not talked to A.H. to determine what her trial testimony would have been, Goodpasture has not demonstrated that her testimony would have appreciably advanced the defense case, let alone possibly altered the outcome. If Parrish was aware of A.H.'s potential testimony, he presumptively did not provide deficient representation in choosing to go ahead with the trial rather than asking for a continuance to secure her presence as a defense witness. If Parrish was not aware of A.H.'s proposed testimony, he

29

may have provided deficient representation, but Goodpasture cannot establish that the deficient representation caused him legal prejudice, i.e., a reasonable probability of a different outcome at trial.

*Conclusion*

We have considered the detailed arguments Goodpasture has presented on appeal, the lengthy 60-1507 record, the district court's thorough order, and, of course, the full record in the direct criminal case. Based on that review, we conclude the district court did not err in denying Goodpasture's motion for habeas corpus relief from his convictions and sentences.

Affirmed.